# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 15, 2011            Decided June 7, 2011

No. 10-1031

LEPAGE'S 2000, INC. AND LEPAGE'S PRODUCTS, INC.,
PETITIONERS

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

———

Consolidated with 10-1033, 10-1279, 10-1294

———

On Petitions for Review of an Order
of the Postal Regulatory Commission

———

*David Himelfarb* argued the cause for petitioners LePage's 2000, Inc. and LePage's Products, Inc. With him on the briefs were *Daniel J. Kelly* and *Bonnie A. Vanzler*.

*Miriam R. Nemetz* argued the cause for petitioner United States Postal Service. With her on the briefs was *Kenneth S. Geller*.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Tony West*, Assistant Attorney General, *Michael S. Raab*, Attorney,

*Stephen L. Sharfman*, General Counsel, Postal Regulatory Commission, *R. Brian Corcoran*, Deputy General Counsel, and *Kenneth E. Richardson*, Attorney.

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: The United States Postal Service, LePage's 2000, Inc., and LePage's Products, Inc. (the latter two collectively "LePage's"), seek review of a Postal Regulatory Commission order classifying the Service's licensing of its intellectual property for use on third-party mailing and shipping supplies as "nonpostal" under the Postal Accountability and Enhancement Act, and requiring the Service to discontinue that activity. The petitioners contend that the Commission improperly departed from a previous order without explanation and failed to support its findings with sufficient evidence. We agree with petitioners' first argument. We therefore grant the parties' petitions for review, vacate the Commission's order, and remand for further proceedings consistent with this opinion.

I

As we explained last year in a companion to this case, Congress created the modern government-owned corporation known as the United States Postal Service in 1970, and imbued it with the power not only to deliver the mail, but also to provide special "nonpostal" services. *See USPS v. Postal Regulatory Comm'n*, 599 F.3d 705, 706 (D.C. Cir. 2010). Accordingly, the Service engaged in a number of ventures "unrelated or only tangentially related to the delivery of mail," to the point where such activities became quite "substantial." *Id.* Such activities include the Service's licensing of its intellectual property for use

on commercially-available consumer products sold at third-party retail locations.

The commercial licensing program encompasses several different categories of goods, including apparel, pet products, and fashion accessories. At issue in this case is the Service's commercial licensing of third-party mailing and shipping supplies, which includes products related to the Service's core business of delivering the mail. The Service had five license agreements in this program – which, for simplicity's sake, we will refer to as the "Bubblewrap program" – although only one remains in effect: an agreement with LePage's. That agreement permits LePage's to sell mailing and shipping supplies (such as boxes, padded envelopes, bubblewrap, tape, packing materials, packing tap, and return mailing labels) branded with the United States Postal Service corporate logo at non-Postal Service retail outlets. Each product that LePage's sells indicates that it is the manufacturer and that the Service is the licensor.

\* \* \*

Congress expressed skepticism throughout the 1990s about the Service's nonpostal activities, and considered legislation to eliminate or limit its authority to engage in such activities. These efforts crescendoed after a 2003 presidential blue-ribbon commission found the Service's nonpostal activities "dubious" and "far afield" of the Service's "basic function." *Id.* The commission noted that the Service's nonpostal activities largely had not been profitable, created market distortion, and distracted the Service from its basic function. It therefore recommended that Congress "restrict the Service's authority to include only services directly related to the delivery of mail." *Id.* at 707.

Congress responded with the Postal Accountability and Enhancement Act ("the Act"), Pub. L. No. 109-435, 120 Stat.

3198 (2006). The Act significantly limited the Service's ability to engage in nonpostal activities, which it defined as "any service that is not a postal service." A "postal service" included "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." The Act precluded the Service from offering new nonpostal services after its passage, while permitting nonpostal services offered before January 1, 2006, to continue pending review by a newly-created Postal Regulatory Commission. The Commission was charged with reviewing each nonpostal service offered by the Postal Service; it could approve for continuation a nonpostal service if the Commission concluded that there was a (1) public need for the service and (2) the private sector could not meet the public need for the service. But the Commission was required to terminate any nonpostal service that did not meet both statutory criteria.

In December 2007, the Commission began its review of the Service's activities. During the first part of the proceedings – termed "Phase I" – the Service argued that several of its programs should be classified as "postal services" and therefore permitted to continue without further review under the Act. These include the "ReadyPost" program, "a Postal Service-branded line of shipping supplies designed for sale in post office retail locations," the customized postage program, a form of postage prepayment in which private companies licensed by the Service allow consumers to obtain custom postage, and the greeting card program, in which third-party stationery is sold in post office retail locations. Review of Nonpostal Services Under the Act ("Phase I Order") (Dec. 19, 2008), 32-35, *reprinted at* J.A. 504.

The Commission agreed with the Service that the three programs should be classified as "postal services." It concluded that the ReadyPost program was a "postal service" because its

products were "postal related;" they would be mailed, were designed to meet customers' mailing needs, and, since they were displayed at Service locations, "offer[ed] convenience to the customer and ma[de] access to the mailstream easier." The customized postage program was a "postal service" because it represented a "form of of postage prepayment, a core function of the Postal Service." And the greeting card program was a "postal service" because the products fostered use of the mails.

In the Phase I proceedings, the Service also sought to have the Commission continue several activities that it conceded were "nonpostal services." Relevant here is the Officially Licensed Retail Products program, through which the Service sells postal-branded and -themed products at Service retail locations. The products include both items that assist customers in the use of the mails – such as scales and stamp dispensers – and branded miscellaneous items – such as teddy bears and key chains. Applying the two-part statutory criteria laid out in the Act, the Commission concluded that there was a "public need" for what we will call the "Bears and Scales program" because it "leverages the Postal Service's brand, advertises and enhances its image, and, through the revenues generated, helps support the Postal Service's core mission." *Id.* at 49. The Commission found that the private sector could not meet this need because no other entity would be able to provide the Service's intellectual property (its brand) to manufacturers. The Commission therefore permitted the Bears and Scales program to continue as a nonpostal service.

The Commission lastly considered the Service's commercial licensing program for third-party products.[1] It first

---

[1] The Service took the position that commercial licensing was not subject to review under the Act because it was authorized by a separate statute. The Commission rejected this argument.

noted that the commercial licensing program was a "nonpostal service" because "[w]hen the Postal Service acts as a licensor, it is granting the right to use its intellectual property [, in other words its brand,] on consumer goods." *Id.* at 71. The Commission therefore assessed whether the program should be continued under the Act's two-part criteria. It found the Service's commercial licensing program serves a public need because it generates revenues, benefits mailers, and promotes and gives recognition to the Service's brand. And it concluded that since only the Service could license its intellectual property, the private sector could not meet the public need for the program. *Id.* at 73. The Commission therefore stated that commercial licensing, "as a general matter," could continue. *Id.*

Nevertheless, the Commission noted that its conclusion was "not unqualified." It observed that commercial licensing that related to the Service's core business of delivery of the mail – the Bubblewrap program – "raise[d] a host of issues" that were not sufficiently developed in the record for the Commission to assess. *Id.* at 74. The Commission therefore permitted such licenses to continue pending their full consideration in a subsequent proceeding. In a clarification order, the Commission indicated that the Phase I order was appealable, except as to its conclusions regarding the commercial licensing program, which were deemed to be interlocutory. The Service appealed the Phase I order, which we upheld. *See Postal Regulatory Comm'n*, 599 F.3d at 706.

While the Service's appeal was pending, the Commission began the second phase of the Act's mandated review. LePage's, which had not been a party to the Phase I proceedings, filed a motion to intervene that the Commission granted. The Commission first confirmed that the Service's commercial licensing program for products other than mailing and shipping supplies – such as apparel, pet products, and fashion accessories

– met the two criteria of the Act and therefore could continue. It therefore turned to the question whether the Service may continue the Bubblewrap program.

The Commission found that there was no public need for the Bubblewrap program. It observed that the benefits it identified for the Service's commercial licensing program generally "are not sufficient to support a finding of public need" for the Bubblewrap program. Phase II Review of Nonpostal Services Under the Act ("Phase II Order") (Jan. 14, 2010), 14-15, *reprinted at* J.A. 875. In the Commission's view, the benefits were "either without sufficient evidentiary support or mitigated by factors that are not applicable" to other trademark licensing. *Id.* at 15. Specifically, it identified two "mitigating" factors that it believed outweighed any benefits of the Bubblewrap program.

First, the Commission noted that USPS-branded products sold by third parties could confuse consumers: consumers may believe that the Service is selling, and standing behind, the licensed mailing and shipping supplies. Second, it found that the Bubblewrap program could disrupt markets. It based this conclusion on two predictions: that because the Service's monopoly over the delivery of mail gave it "perceived expertise" over mailing and shipping supplies, USPS-branded supplies may have an advantage over other products in the consumers' minds, and "when the Postal Service competes in a market where the Postal Service provides regulatory oversight of a product or system, there is the potential for unfair competition." *Id.* at 19.

The Commission also found that the Service had failed to demonstrate that the private sector was unable to meet any public need for the Bubblewrap program. It observed that the "USPS-branded products are sold in large chain stores where

similar alternative products are available in the absence of the USPS brand." *Id.* at 24.  And therefore the Commission stated that it could not "conclude that the USPS-branded mailing and shipping products are sufficiently different from competitor products that the private sector is not able to meet the public need for these products." *Id.* at 25.  It ordered the Service to terminate the Bubblewrap program.

After the Commission issued its Phase II order, both the Service and LePage's timely filed petitions for review in this Court.  The Service subsequently asked the Commission to stay the termination of the Bubblewrap program on the ground that the Service had sought review of the Commission's Phase I order.  The Commission denied this request as moot when we upheld that order.

Following the publication of our opinion, however, and apparently unaware of the Commission's ruling finding moot the Service's motion to stay, LePage's filed a notice with the Commission indicating its support for the Service's motion to stay, and promising that a "comprehensive submission" would follow "shortly."  Three months later, in June 2010, the Service again requested a stay in order to permit the Commission to address LePage's as-yet-unfiled submission.  In July 2010, nearly three-and-one-half months after its original notice, LePage's asked the Commission to reconsider its Phase II order, or, in the alternative, to stay the Commission's ruling pending resolution of the petition for review of the Phase II order.  The Service later submitted its own petition for reconsideration. The Commission denied both petitions for reconsideration, holding that they were untimely and raised no new arguments that could not have been raised during the Phase II proceeding.  The Commission, however, stayed its Phase II order pending our review.  Both the Service and LePage's sought review of the Commission's denial of their motions for reconsideration, which

we consolidated with the previously-filed petitions to review the Phase II order.

## II

The Service contends that the Commission's Phase II order is unreasonable because the Commission's decision to find that the Bubblewrap program did not serve a public need departed abruptly from its Phase I position that the Service's commercial licensing program *did* serve a public need. The Service also argues that the Commission's conclusion that there is no public need for the Bubblewrap program is not supported by substantial evidence.

Finally, the Service objects to the Commission's finding that the private sector could meet the public need for the Bubblewrap program. According to the Service, in the Phase I order, the Commission concluded that there was no private-sector alternative to the Service's commercial licensing activities because no other entity could grant a license for the Service's intellectual property (its brand). But in its Phase II order, the Commission ignored this conclusion and instead found that the public need for the Bubblewrap program could be satisfied by similar *products* that do not bear the Service's trademark. The Service objects to this unexplained change of position.[2]

LePage's largely mirrors the Service's challenges to the merits of the Phase II order, but raises two additional arguments

---

[2] The Service also suggests that even if the Commission is correct in concluding that there is no public need for the Bubblewrap program, the Commission should not have terminated the program. Rather, it should have adopted a more measured regulatory response to address the issues it highlighted.

that the Service did not present. First, the Commission erred by classifying the Bubblewrap program as a "nonpostal service."[3] LePage's observes that the Commission decision regarding the program is untenable in light of the Commission's conclusion that the ReadyPost program, the customized postage program, and the greeting card program are "postal services." Second, the Commission improperly considered the economic effects of the Bubblewrap program products as part of its "public need" inquiry. LePage's also argues that the Commission's failure to consider LePage's' motion for reconsideration on timeliness grounds was arbitrary and capricious because neither the Act nor the Commission's rules imposed any deadline for filing such motions.

The Commission contends that LePage's is wrong that the Commission should have classified the program as a "postal service" because the activity at issue – licensing – does not meet the definition of a "postal service" in 39 U.S.C. §102(5). The programs the Commission classified as "postal services" all involve sales directly made by the Service, which distinguishes them from licensing. The Commission asserts, moreover, in response to both the Service and LePage's, that it rightly found that the program did not serve a public need that could not be met by the private sector by redeploying the arguments it offered below. It also maintains that it reasonably denied LePage's motion for reconsideration on timeliness grounds, given that it was filed approximately six months after the Commission issued its Phase II order. In any event, the Commission notes that because the motion failed to present new evidence that LePage's

---

[3] LePage's, somewhat confusingly, suggests that the Commission did not classify as "postal" or "nonpostal" the Bubblewrap program as it was required to do under the Act. But this is belied by the record. *See* Phase I Order at 71; Phase II Order at 8.

could not have presented earlier, we do not have jurisdiction to review it.[4]

*    *    *

The Commission's order is rife with anomalies, any one of which is sufficient to justify a remand, and all of which, when considered together, demonstrate the Commission was proceeding in a slapdash manner. We begin with LePage's' argument that the Commission erred by classifying as a "nonpostal service" the Bubblewrap program. According to LePage's, its sale of licensed mailing and shipping supplies meets the definition of a "postal service" because the sale of such supplies is "ancillary to the carriage of mail." 39 U.S.C. § 102(5). Indeed, it suggests that the products it is selling are akin to the products sold as part of the programs that the Commission found to be "postal services" in its Phase I order. For example, the LePage's products, like ReadyPost and greeting cards, are designed to meet customers' mailing needs, foster use of the mails, and aid access to the mailstream. And LePage's products, like customized postage, includes Service-licensed intellectual property.

The Commission offers a simple response in its brief: LePage's wrongly focuses on *its* sale of mailing and shipping supplies as the activity that determines whether a service is "postal" or "nonpostal." According to the Commission, the Act requires it to review each activity "*offered by*" the Service to

---

[4] The Commission also asserts that the Service is incorrect in suggesting that the Commission could have adopted regulatory measures short of termination once it found that there was no public need for the Bubblewrap program. We agree. Congress instructed that the Commission "shall terminate" any service not authorized under the Act. 39 U.S.C. § 404(e)(4).

determine if it is "postal" or "nonpostal." *See* 39 U.S.C. § 404(e)(3) (emphasis added). With regard to the Bubblewrap program, the only activity "offered by" the Service is licensing, which the Commission has concluded does not meet the definition of a "postal service." By contrast, ReadyPost and the greeting card program are "postal services" because in each case the Service sells mailing and shipping supplies at its retail locations and on its website. And the customized stamp program is a "postal service" because it involves the sale of postage to third parties. In other words, the Commission seems to assert that so long as it is the Service itself that sells mailing and shipping supplies, it is a "postal service."

The Commission may well be correct that the crucial distinction is the seller's identity. But whatever the merits of this position, we cannot consider it because the Commission did not set it forth below. It did not label ReadyPost, the greeting card program, or the customized postage program "postal" because they involved sales by the Service itself. And we, of course, "cannot 'accept appellate counsel's post hoc rationalizations for agency action'; for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 397 (1974) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962)). Indeed, the position the Commission presses now is inconsistent with the position it took below, where it assessed whether the *products* at issue – as opposed to the activity offered by the Service – could "reasonably be viewed as ancillary to the carriage of mail." Phase I Order at 33.

Distinguishing the Bubblewrap program from ReadyPost and the greeting card program based on the rationale offered below (to the extent the Commission still relies on it) is untenable. The Commission found ReadyPost and the greeting

card program to be "postal services" because these products fostered use of the mail and enhanced consumers' convenience. Yet, as LePage's and the Service persuasively argue, these articulated factors apply to the Bubblewrap program as well. The Bubblewrap program products – indistinguishable from the ReadyPost products, *compare* Phase I Order at 32, *with* Supplemental Statement of Gary Thuro (Jan. 30, 2009), 2, *reprinted at* J.A. 634 – meet customers' mailing needs, make access to the mailstream easier, and, because they are available in a many retail establishments, improve customer convenience.[5] We remand the Phase II order to the Commission to explain its departure from the Phase I order and to adopt a reasoned rationale for classifying the Bubblewrap program a "nonpostal service."

## III

We turn now to the petitioners' alternative argument challenging the Commission's conclusion that there is no public need for the Bubblewrap program.

It will be recalled that the Commission found no public need for the program because "[a]ny benefits are outweighed by the disadvantages of selling USPS-branded products that can confuse consumers and disrupt markets." Phase II Order at 15. But the Commission's assessment of the benefits of the Bubblewrap program is flawed. In its Phase I order, the Commission determined that commercial licensing, as a general matter, served a public need because it generated revenue, benefitted mailers, and gave recognition to the Service's brand.

---

[5] It is of no moment that, as the Commission observed, the Bubblewrap program may generate less mail for the Service than sales of the same supplies at Service retail locations. A mere comparison of volume cannot save the Commission.

In its Phase II order, the Commission again recognized these benefits, yet noted that they were "without sufficient evidentiary support" for the Bubblewrap program. *Id.* at 14-15. But the evidence the Commission relied on for the benefits of the commercial licensing program – a statement from the Service's manager of licensing – did not distinguish between different types of commercial licensing. The Commission does not explain how it can read the same evidence differently when applied to different aspects of the same program.

The Commission recognized, moreover, in finding a public need for the Bears and Scales program, that the Service's sales of USPS-branded mailing and shipping products serve the same public need as commercially-licensed products generally: they "leverage[] the Postal Service's brand" and "help[] support the Postal Service's core mission." Phase I Order at 49. We do not understand why these same benefits would not accrue to the Bubbewrap program, which aside from the seller's identity, is substantially similar to the Bears and Scales program. At the least, the Commission must explain this differential treatment of seemingly like cases. *See Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

LePage's would have us go further and hold unreasonable the supposed disadvantages of the Bubblewrap program that the Commission identified. As we discussed, the Commission concluded that the Bubblewrap program *products* will cause customer confusion and will result in market distortion. According to LePage's, the Act does not permit the Commission to analyze "public need" based on the predicted economic effects of a product. We find some merit in this position. The Act requires the Commission to assess the "public need" for the service "offered by" the Postal Service. 39 U.S.C. § 404(e)(3)(A). Yet the service offered by the Postal Service in the Bubblewrap program is, of course, the licensing of

intellectual property. The Commission's focus on the economic effect of the *products* that result from licensing, then, would seem to depart from the Act's plain language.

Nevertheless, we need not resolve this issue of statutory interpretation (nor whether the Commission's interpretation of "public need" is entitled to deference) because the Commission's assessment of "public need" in its Phase II order departs from the Phase I order. In the Phase I order, the Commission noted that it would consider a variety of factors in analyzing public need: "the demand for the service, its availability, its usefulness, whether it is a customary business practice, or serves the efficiency of operations." Phase I Order at 39. All of these factors focus on the public need for the service, not the products resulting from that service, a point that the Commission makes clear in its own analysis. In concluding that commercial licensing served a public need, the Commission observed that *licensing* "generat[ed] revenues and "benefitt[ed] mailers." Phase I Order at 73. It could not have been concerned with the commercially-licensed products themselves because they generate no revenue for the Service; they are manufactured and sold by third parties. The Commission, however, subtly, and without explanation, changed this approach in its Phase II order, assessing the disadvantages of the Bubblewrap program based only on the program's *products*.

Further, the Commission never indicated in its Phase I order that it was going to consider economic impact as part of its "public need" inquiry. In fact, the Commission's only reference to economic impact in its Phase I order occurs in its discussion of how it intends to analyze whether the private sector can meet a public need for a nonpostal service. Yet we perceive no

explanation of how this concern migrated, in Phase II, to the Commission's "public need" inquiry.[6]

\*　　\*　　\*

Although the Commission's finding that there was no public need for the Bubblewrap program required it to terminate the program, *see* 39 U.S.C. § 404(e)(3) (service must *both* meet a public need and be without a private sector alternative to continue), it went on to hold that the private sector could meet any public need for the program. Petitioners challenge this conclusion, contending that the Commission departed without explanation from its Phase I conclusion that the private sector could not possibly meet the public need for commercial licensing. We agree. In Phase I, the Commission held that commercial licensing could not be met by the private sector because no entity other than the Service could license its intellectual property. In Phase II, however, the Commission changed course, explaining that other entities were able to provide substitutes for the licensed mailing and shipping *products*. In other words, the Commission altered its analytic frame from the activity the Service engaged in to the products that resulted from that activity.

The Commission offered no reason for this departure. And we, of course, cannot uphold a decision "where an agency departs from established precedent without a reasoned explanation." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995); *accord Motor Vehicle Mfrs. Ass'n v. State*

---

[6] Both the Service and LePage's also contend that the Commission failed to support its catalogue of disadvantages of the Bubblewrap program. Because we do not know what the Commission's order after remand will look like, we cannot address this argument here.

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983). Nor, in fact, do we see how the Commission could adopt the position it does in its Phase II order. As we discussed – and as the Commission itself argues before us – under the Act, the Commission must assess the activity the Service offers. In the case of commercial licensing – whether for mailing and shipping supplies or for other products – that activity is licensing. Therefore, for the Commission to review the private sector factor by assessing ability of the private sector to provide similar products would bring the Commission into conflict not only with the Act, but also with its (newly-minted) rationale for classifying commercial licensing a "nonpostal service."[7]

IV

For the foregoing reasons, we grant the petitions to review the Phase II order, vacate the order, and remand for further proceedings consistent with this opinion. The Commission has much work to do on remand remedying the abundant inconsistencies in its order.

*So Ordered.*

---

[7] Because we find that the Phase II order is arbitrary and capricious, we need not address LePage's' additional argument that the Commission erred in denying LePage's' motion for reconsideration.