# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 20, 2014          Decided May 12, 2015

No. 13-1308

UNITED STATES POSTAL SERVICE,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

ALLIANCE OF NONPROFIT MAILERS, ET AL.,
INTERVENORS

———

On Petition for Review of an Order
of the Postal Regulatory Commission

———

*David C. Belt*, Attorney, U.S. Postal Service, argued the cause for petitioner. With him on the briefs was *Morgan E. Rehrig*, Attorney. *Stephan J. Boardman*, Attorney, entered an appearance.

*Dana L. Kaersvang*, Attorney, U.S. Department of Justice, argued the cause for respondent. On the brief were *Stuart F. Delery*, Assistant Attorney General, *Michael S. Raab* and *Benjamin M. Shultz*, Attorneys, *David A. Trissell*, General Counsel, Postal Regulatory Commission, and *R. Brian Corcoran*, Deputy General Counsel.

*William B. Baker*, *David M. Levy*, *William J. Olson*, *Jeremiah L. Morgan*, and *John S. Miles* were on the brief for intervenors Alliance of Nonprofit Mailers, et al. in support of respondent.

*Matthew D. Field* entered an appearance.

Before: TATEL, *Circuit Judge*, WILKINS, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: On November 21, 2013, the Postal Regulatory Commission ("Commission") issued Order No. 1890, *Order on Price Adjustments for Market Dominant Products and Related Mail Classification Changes* ("Order on Price Adjustments"), *reprinted at* J.A. 361. The Order rejected proposals that had been submitted by the United States Postal Service ("Postal Service" or "Service") to implement price adjustments to certain of its market-dominant products as well as classification changes in conjunction with the price changes. The United States Postal Service now seeks review of this Order.

The Postal Accountability and Enhancement Act ("Act") generally forbids the Postal Service from raising the rates on its market-dominant products faster than the rate of inflation. 39 U.S.C. § 3622(d)(1)(A). Under the Act, the Commission is charged with "regulating rates and classes for market-dominant products," *id.* § 3622(a), which includes promulgating regulations implementing the inflation-based price cap. Pursuant to this authority, the Commission has adopted regulations requiring the Postal Service to account for the effects that reclassifying mail would have on the rates

charged for that mail. *See* 39 C.F.R. § 3010.23(d). For example, in accordance with these regulations, if the Postal Service deletes a price from its price list, thus forcing a reclassification of the mail that had been charged that price during the prior year, it must account for the reclassification when computing any accompanying changes in rates. Thus, if the reclassified mail would now be charged a higher price – for instance, because the deleted price was a temporary discount – then the extra cost for shipping that mail counts against the price cap. The deletion of the discounted rate causes a reclassification of certain mail and effectively raises the rate on the previously discounted mail.

In April 2013, the Postal Service amended its mail preparation requirements so that mail pieces prepared according to the "basic-service Intelligent Mail" standard would no longer be eligible for a discounted "automation" rate available to mailers who use technologies to increase the Postal Service's efficiency. Implementation of Full-Service Intelligent Mail Requirements for Automation Prices, 78 Fed. Reg. 23,137, 23,137 (Apr. 18, 2013). In subsequent rate change proceedings before the Commission, mailers objected that this change in mail preparation requirements constituted a classification change resulting in an increase in rates that must be counted against the Postal Service's price cap. The Postal Service disagreed, arguing that mail preparation changes that did not actually alter the posted prices were not "changes in rates" within the plain meaning of the price cap statute or "classification changes" within the plain meaning of the Commission's regulations, and therefore their effects did not count toward the price cap.

The mailers prevailed before the Commission. *See* Order on Price Adjustments at 1–2. The Commission held "that the new mail preparation requirements redefine rate cells because

they require mailers to alter a basic characteristic of a mailing in order for the mailing to qualify for the same rate category for which it was eligible before the change in requirements." *Id.* at 18. The Commission thus concluded that the rate effects of the mail preparation requirements change, combined with the Postal Service's other proposed rate increases, would violate the inflation-based price cap. *Id.* at 2.

The principal issue in this case is whether the Commission is correct in its view that its rate cap authority extends beyond the regulation of posted rates to regulation of Postal Service operational rules that have "rate effects." The Postal Service contends that the Act and applicable regulations plainly forbid the Commission from characterizing mail preparation requirements as "changes in rates." In addition, the Postal Service argues that the Commission's Order on Price Adjustments is arbitrary and capricious because the standard that it invokes to determine when changes in mail preparation requirements constitute "changes in rates" is incomprehensible.

In our view, the Act and applicable regulations are ambiguous with respect to whether the Commission's authority extends to the regulation of operational rules that have "rate effects." We therefore reject the Postal Service's claim that the "plain meaning" of the Act and regulations positively forbid the Commission from counting an operational change that has rate effects as a "change in rates." The Commission's interpretation of the Act thus does not fail under Step One of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We agree with the Postal Service, however, that the Commission's Order cannot survive arbitrary and capricious review. The standard enunciated by the Commission to determine when requirements changes are "changes in rates" seems boundless

and, thus, unreasonable; and the Commission's inconsistent application of the standard in this case proves the point.

An agency action must be supported by "reasoned decisionmaking," whether taken in the course of rulemaking or adjudication. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). The Commission's judgment in this case "lacks any coherence. We therefore owe no deference to [the Commission's] purported expertise because we cannot discern it." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006). We therefore remand the case to the Commission to enunciate an intelligible standard and then reconsider its decision in light of that standard.

## I. BACKGROUND

### A. *The Cap on Changes in the Postal Service's Rates*

"In 1970, what was formerly the cabinet-level Post Office Department was transformed by statute into the modern government-owned corporation known as the United States Postal Service." *USPS v. Postal Regulatory Comm'n*, 599 F.3d 705, 706 (D.C. Cir. 2010). As part of that transformation, Congress created the Postal Rate Commission to oversee a system in which the Postal Service established rates based on its actual costs, with the goal of breaking even. *See United Parcel Serv., Inc. v. USPS*, 184 F.3d 827, 829–30 (D.C. Cir. 1999). After criticism that the cost-based ratemaking model failed to incent the Postal Service to operate efficiently, and for other reasons, Congress reformed the ratemaking scheme by enacting the Postal Accountability and Enhancement Act in 2006.

The Act separated the Postal Service's product classes into two differently regulated groups: "market-dominant products" and "competitive products." *See USPS v. Postal Regulatory Comm'n*, 676 F.3d 1105, 1107 (D.C. Cir. 2012). "Market-dominant products" include the various products for which the Postal Service enjoys a statutory monopoly, or for which the Postal Service exercises sufficient market power so that it can effectively dictate the price of such products without risk of losing much business to competing firms. *See* 39 U.S.C. § 3642(b)(1), (2). Remaining products, for which the Postal Service faces meaningful market competition, are classified as "competitive products" and are not at issue in this case.

The Act completely reformed the ratemaking system for market-dominant products. To alleviate concerns that the Postal Service would improperly leverage its monopoly powers over these products, the Act subjected them to a price cap, forbidding "changes in rates" to rise faster than inflation:

> The system for regulating rates and classes for market-dominant products shall—
>
> (A) include an annual limitation on the percentage changes in rates to be set by the Postal Regulatory Commission that will be equal to the change in the Consumer Price Index for All Urban Consumers . . . over the most recent available 12-month period preceding the date the Postal Service files notice of its intention to increase rates[.]

*Id.* § 3622(d)(1)(A).

The price cap does not apply directly to every individual product, however. Rather, it applies to each "class" of products, as defined by statute. *Id.* § 3622(d)(2)(A). As a

result, the Postal Service can raise the price of one product in a mail "class" by more than the rate of inflation if that over-inflation increase is offset by lower rises or reductions in other products in the class. For example, the Postal Service can raise the rate of one kind of first-class mail by more than the rate of inflation as long as it offsets that increase with a lower rise in another kind of first-class mail.

In addition, because market-dominant prices can be raised to track inflation regardless of the Postal Service's actual costs, the Postal Service can keep savings it creates through cost cutting. On the other hand, if the Postal Service's costs rise faster than the rate of inflation then, barring extraordinary circumstances justifying a rate increase, the Postal Service may not be able to cover its costs. Thus, the inflation-based price cap protects mailers from the "unreasonable use of the Postal Service's statutorily-granted [and de facto] monopoly" power while creating new pricing flexibility, incentives for the Postal Service to reduce costs, and the opportunity for the Postal Service to earn a profit. S. REP. NO. 108-318, at 19 (2004).

## B. *The Commission's Implementation of the Price Cap*

The Act also reformed the Postal Rate Commission into the Postal Regulatory Commission and required it to promulgate regulations "whereby the Postal Service may adjust rates not in excess of the" price cap. 39 U.S.C. § 3622(d)(1)(D). The Commission's regulations seek to ensure that the class-level price cap serves as an effective limit on the Postal Service's rates by plugging several potential gaps in the cap. Thus, for example, the Commission's rules ensure that the Postal Service may not generate extra revenue beyond the price cap by taking advantage of the different volume levels of different products

within a class to raise rates unevenly while technically complying with the class-level price cap. To achieve this, the Commission has promulgated regulations specifying that the calculation of a "change in rates" in a class should be weighted by the mail volume of any given rate cell in a class. 39 C.F.R. § 3010.23(b). So, if the Postal Service has two rate cells in a given class but one of them accounts for the lion's share of the mail volume, any increase in the rate for that rate cell will be weighted according to volume when determining its contribution toward the class-wide rate change cap. Small increases in the rate for small-volume rate cells cannot be used to obscure large increases in the rate for the large-volume rate cells that generate the most revenue. By default, the volume levels of the various products are to "be obtained from the most recent available 12 months" of data. *Id.* § 3010.23(d)(1).

The Commission's regulations also seek to prevent the Postal Service from evading the price cap by shifting mail to more expensive rates. Because the Postal Service often changes the classification of its mail, for example by adding, deleting, or redefining rate cells, it is possible that some mail will shift between different rates. The Commission determined that shifting identical mailpieces between different rates would constitute "changes in rates" for those mailpieces. The Commission thus required the Postal Service to factor the effects of classification changes into the calculation of changes in rates by adjusting the volume associated with each rate cell in sync with any changes to the treatment of mailpieces. The applicable regulation states:

> The Postal Service shall make reasonable adjustments to the billing determinants [i.e., volume levels] to account for the effects of classification changes such as the introduction, deletion, or redefinition of rate cells.

*Id.* § 3010.23(d)(2).

As noted above, this regulation prevents the Postal Service from circumventing the price cap by shifting mail volume into more expensive rate cells. If a discounted rate is "deleted," forcing a mailer to pay a higher price for their piece of mail, that price increase would be captured and counted toward the price cap. The regulation thus codifies an important precept: that the rate on the discounted mail has essentially been raised by being forced into a higher rate cell, independently of whether the posted price in either the new or original rate cell has been changed.

Moreover, at the urging of the Postal Service and to simplify the calculation of the effect of classification changes, the Commission has required the Postal Service to use historical volume data and known mail characteristics (rather than forecasts of changes in mailer behavior) when determining the effects of classification changes. The applicable regulation essentially requires the Postal Service to assume a "constant mail mix" – measuring changes in rates as if last year's mail were being sent under the new proposed rates and rules. The regulation states:

> Whenever possible, adjustments shall be based on known mail characteristics or historical volume data, as opposed to forecasts of mailer behavior.

*Id.* § 3010.23(d)(3). Although the precise language of the regulation has changed several times, its essence has remained the same: if last year's market-dominant mail in a given class, sent according to the new rates and classification rules, allow the Postal Service to earn more revenues than the inflation-adjusted maximum, the rates violate the cap.

## C. *The Mail Preparation Requirements Change*

As indicated at the outset of this opinion, this case raises questions regarding the scope of the Commission's authority to regulate "changes in rates" pursuant to the price cap statute and its own regulations. The issue between the Postal Service and mailers arose when the Service changed mail preparation requirements that would have the likely effect of changing rates paid by certain mailers for sending the same mailpieces that they sent in the prior year. The parties dispute, among other things, whether such a change is a "classification" change within the meaning of the Commission's regulations, and whether such a classification change can result in a "change in rates" within the meaning of the Act. Understanding the mail preparation requirements change and its potential rate effects serves as a crucial starting point in this case.

The Postal Service offers "automation discounts" on many of its market-dominant products to mailers who are willing to prepare and tender mailpieces using technologies that reduce the Postal Service's costs. While the official, posted rates for these discounts are subject to approval by the Commission, the Postal Service retains discretion to define *eligibility* for many of these automation rates through its power to create mail preparation requirements. For example, the Postal Service may sometimes define which automation procedures entitle mailers to the discounts. These procedures are published in the Domestic Mail Manual ("Manual"), which contains the detailed operational rules governing the mail products described in the formal Mail Classification Schedule overseen by the Commission. *See* Br. of the U.S. Postal Serv. 13.

One form of automation approved by the Manual is the use of "Intelligent Mail" standards, which essentially involve affixing barcodes to mailpieces to enable the Postal Service to simplify mail acceptance, processing, and tracking. Since January 2009, the Postal Service has allowed mailers to use two different Intelligent Mail standards, receiving two different discounted rates: "basic-service" Intelligent Mail, a less demanding standard that receives a smaller discount; and "full-service" Intelligent Mail, a more demanding standard that receives a larger discount. Basic-service Intelligent Mail requires mailers to affix a barcode to each mailpiece containing some basic information about the shipment, and to schedule pick-up through a designated electronic scheduling system. *See generally* Implementation of Intelligent Mail® Barcodes, 73 Fed. Reg. 1158, 1160 (Jan. 7, 2008). Full-service Intelligent Mail requires mailers to affix to each mailpiece a barcode that uniquely identifies that mailpiece; to place specialized barcodes on trays, sacks, and other containers; to submit postage and mail shipment information electronically; and to schedule certain pickups using a specified electronic system. *See generally id.* at 1159–60.

In April 2013, the Postal Service provided public notice that it was amending the Manual to change the eligibility requirements for its automation rates, promulgating the regulation that is at the heart of the dispute in this case. 78 Fed. Reg. 23,137. The Postal Service announced that use of the basic-service Intelligent Mail standard would no longer entitle mailers for any automation discount. Meanwhile, the full-service Intelligent Mail discount would remain unchanged. For that reason, mailers using the basic-service standard who wanted to retain an automation discount would have to upgrade their systems to full-service Intelligent Mail, but would be rewarded with the greater full-service discount. Mailers who did not upgrade their systems to comply with the

full-service requirements would have to pay the higher, undiscounted rates. The Manual change did not actually change the posted automation rates; it changed only the eligibility rules according to which mailpieces could qualify for those rates.

### D. *The Proceedings Before the Commission*

In September 2013, the Postal Service separately notified the Commission that it intended to raise its posted prices for a variety of market-dominant products. Order on Price Adjustments at 1. The parties did not dispute that these noticed price increases, by themselves, fell within the inflation-based price cap established by statute. Various commenters objected to the rate increases, however, stating that they did not take account of the changes to mail preparation requirements eliminating basic-service Intelligent Mail's eligibility for an automation discount. That change, they argued, was a "classification change" within the meaning of 39 C.F.R. § 3010.23(d) because it made basic-service mail of the kind sent in the prior year ineligible for an automation rate; in other words, it "redefined" the discounted rate cell and reclassified the basic-service mail into a higher rate cell. The commenters further argued that this change resulted in a "change in rates" for basic-service Intelligent Mail within the meaning of the price cap statute because those same basic-service mailpieces would now be charged a higher rate. Thus, the commenters argued that if the Postal Service's rate change proposal was adjusted to account for the supposed change in rates arising from the mail preparation requirements, the Postal Service had exceeded the price cap.

The Postal Service disagreed. In the proceedings before the Commission, the Postal Service argued that the price cap statute and regulation forbid the Commission from

considering the effects of Manual changes as changes in rates. Regarding the price cap language of 39 U.S.C. § 3622(d)(1)(A), the Postal Service argued that Manual changes were not "changes in rates" because they did not actually change the rates posted in the formal Mail Classification Schedule. According to the Postal Service, changes to the mail preparation requirements in the Manual merely changed the requirements to obtain an *existing* rate. The Postal Service insisted that the plain language of the statute could not apply to changes that left the posted rate the same.

Regarding the Commission's regulation, the Postal Service claimed that Section 3010.23(d), requiring the Postal Service to make adjustments for "classification changes such as the introduction, deletion, or redefinition of rate cells," does not apply to operational changes made in the Manual. Instead, the Postal Service contended that the only "classification changes" subject to the rule were changes to the Mail Classification Schedule overseen and approved by the Commission. Order on Price Adjustments at 12. The Postal Service additionally argued that it expected that most mailers would comply with the changes to the mail preparation requirements, and that the Commission should therefore not assume when calculating the change in rates that all basic-service mailers would begin paying higher rates. *Id.* at 13.

Lastly, the Postal Service argued that construing the price cap to apply to mail preparation changes would seriously blur the line between the Postal Service's authority to govern day-to-day operational issues and the Commission's authority to manage rates and classes for market-dominant products, and that doing so would be inconsistent with the Commission's treatment of mail preparation requirement changes in the past.

*See id.* at 12–13. The Postal Service expressed alarm that interpreting "changes in rates" to apply to all mail preparation requirement changes would greatly reduce the flexibility that the Postal Service needs to run its business operations.

The Commission largely agreed with the objectors. The Commission held that "[w]hether one characterizes the [Manual] change as a redefinition or a deletion [of a rate cell], or both, it is a classification change with rate effects that must be recognized in calculating whether the proposed changes in rates comply with the annual limitation established in 39 U.S.C. § 3622(d)(1)(A)." Order on Price Adjustments at 15.

Noting that "the focus of the comments has been on the redefinition of rate cells," *id.*, the Commission set out its legal standard for when a change in mail preparation requirements constitutes a redefinition of a rate cell. The test, it held, was whether

> the new mail preparation requirements . . . require mailers to alter *a basic characteristic of a mailing* in order for the mailing to qualify for the same rate category for which it was eligible before the change in requirements.

*Id.* at 18 (emphasis added).

The Commission rejected the Postal Service's arguments that the "classification changes" mentioned by the regulations were limited to the Mail Classification Schedule superintended by the Commission, noting its own authority to interpret the regulations and that the Postal Service and other commenters had specifically discussed "when changes in mail preparation requirements have significant rate implications" during the regulations' design. *Id.* at 19–20. Additionally, the

Commission dismissed the Postal Service's fear that "deeming *some* new mail preparation requirements to result in rate adjustments will lead to deeming *all* new mail preparation requirements to result in rate adjustments," stating that "[t]he Commission has not and will not indiscriminately treat all new mail preparation requirements as rate adjustments." *Id.* at 25. Pointing to its "basic characteristic of a mailing" standard, the Commission argued it would be able to distinguish between new mail preparation requirements that changed rates and those that did not.

Applying its new standard to the Manual change involving the Intelligent Mail standards, the Commission concluded that the new rules require mailers to "make changes to the basic characteristics of their mailings in order to continue to qualify for the automation discounts for which they are currently eligible." *Id.* at 29. In reaching this conclusion, the Commission noted that mailers must apply unique barcodes to each mailpiece; apply barcodes to trays, tubs, sacks, and containers; ensure that the barcodes at each level are interconnected; and use a designated electronic system to schedule appointments and provide electronic documentation. According to the Commission, these "change[s to] their mailing practices" constitute "change[s to] the basic characteristics of a mailing." *Id.* at 30. The Commission also concluded, in the alternative, that the Manual change was the "deletion" of a rate cell because, after the change, no mailers would be eligible for the lower discounted rate previously applied to basic-service Intelligent Mail users. *Id.* at 31–33.

The Commission also dismissed the Postal Service's objections to its requirement that the Postal Service use historical data, assuming that no basic-service mailers would upgrade to full-service mail, when calculating the rate effects

of the Manual change. *Id.* at 33–35. While the Postal Service argued that, in its experience, most mailers would make the needed upgrades and therefore qualify for the lower rate, the Commission pointed out that its rate change calculation rules require the Postal Service to use known mail characteristics or historical volume data whenever possible, as opposed to forecasts of mailer behavior. *Id.* at 33; *see also* 39 C.F.R. § 2010.23(d)(3). It noted that the historical volume approach had been proposed by and, until recently, supported by the Postal Service as a necessary and wise expedient given the difficulties and controversies surrounding use of forecasts of mailer behavior in ratemaking proceedings. Order on Price Adjustments at 33–35.

The Commission concluded that, since the mail preparation requirement changes resulted in increases in rates on basic-service mailpieces, the Postal Service could not implement both the Manual changes and the noticed price increases without violating the price cap. *Id.* at 35–36. The Commission therefore gave the Postal Service an option: it could either implement the Manual change as scheduled and resubmit proposed rates that fell within the price cap; or it could elect not to implement the Manual change and proceed with its noticed price changes. *Id.* at 36. The Postal Service elected to delay the Manual change and implement its noticed price increases.

This petition for review followed. The Postal Service argues that the plain language of the price cap statute and applicable regulations forbid the Commission from deeming changes to mail preparation requirements to be changes in rates. In addition, the Postal Service argues that the Commission's decision is arbitrary and capricious because it fails to establish a clear and rational standard for which changes to mail preparation requirements it would consider

"changes in rates," resulting in inconsistent application of the standard within the Commission's decision. Finally, the Postal Service argues that the Commission's decision is arbitrary and capricious because the Commission unreasonably refused to consider whether mailers will shift to using full-service Intelligent Mail.

## II. ANALYSIS

"Because the Congress expressly delegated to the Commission responsibility to implement [the price cap statute], we review its interpretation" of that statute under the standards enunciated in *Chevron* and its progeny. *USPS v. Postal Regulatory Comm'n*, 640 F.3d 1263, 1266 (D.C. Cir. 2011). Under *Chevron*'s First Step, if "Congress has directly spoken to the precise question at issue . . . , that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If the statute is ambiguous, *Chevron*'s Second Step then requires us to consider whether the Commission has acted pursuant to delegated authority and, if so, whether its interpretation of the statute is "permissible." *Id.* at 843.

Even if the statute is ambiguous and does not foreclose the Commission's interpretation, however, the Commission's exercise of its authority must be "reasonable and reasonably explained" in order to survive arbitrary and capricious review under the Administrative Procedure Act. *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012). Furthermore, we review the Commission's interpretation of its own regulations with "substantial deference," allowing that interpretation to control unless "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v.*

*Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted).

At the heart of this case is the Commission's interpretation of its statutory and regulatory price cap authority as extending beyond regulation of posted rates to allow regulation of Postal Service mail preparation requirements that may represent classification changes with "rate effects." We hold that the statute and regulations are ambiguous and that, contrary to the Postal Service's arguments, their "plain language" does not forbid regulation of mail preparation requirement changes with rate effects.

We hold, however, that the Commission's decision is arbitrary and capricious because it is not "reasonably explained." *Mfrs. Ry. Co.*, 676 F.3d at 1096. We therefore grant in part the petition for review and remand to the Commission to more clearly enunciate the standard it is using to determine which mail preparation requirement changes are "changes in rates," and to consider again how that standard applies to the preparation requirement changes at issue in this case.

## A.  *The Statute and Regulations Are Ambiguous*

The Postal Service's primary objection to the Commission's Order is that the Commission lacks authority, under both the price cap statute and its implementing regulations, to consider mail preparation requirement changes in the Manual as "changes in rates" that count against the price cap. We disagree.

The Postal Accountability and Enhancement Act's price cap provision states that

[t]he system for regulating rates and classes for market-dominant products shall—

(A) include an annual limitation on the percentage changes in rates to be set by the Postal Regulatory Commission that will be equal to the change in the Consumer Price Index for All Urban Consumers . . . over the most recent available 12-month period preceding the date the Postal Service files notice of its intention to increase rates[.]

39 U.S.C. § 3622(d)(1)(A). Under this statute, the Commission's authority extends only to regulate "changes in rates." A related provision defines "rates" as including "fees for postal services." *Id.* § 102(7).

The critical statutory question in this case is whether "changes in rates" encompasses only changes to the official posted prices of each product, as the Postal Service argues, or also changes to the prices actually applied to particular mailpieces, as the Commission argues. The language of the Act is ambiguous: "Changes in rates" is not specifically defined, and could apply either to the posted rates or the rates that customers actually pay. Neither interpretation conflicts with the statutory definition of "rates" as "fees for postal services," since fees, like rates, can be both posted on a list and charged to specific mailpieces. *See id.* § 3622(d)(1)(A). The language of the statute therefore does not conflict with an interpretation of "changes in rates" as changes in the fees as applied to specific classifications of mailpieces.

Moreover, nothing in the language or purpose of the statute renders unreasonable the Commission's interpretation of "changes in rates" as extending to changes in the rates as they are applied to specific mailpieces. First, as noted, the language of the statute does not provide any relevant

limitation on the rates considered. Second, the Commission points out that the purpose of the price cap statute is to prevent the Postal Service from using its market-dominant power to charge customers unreasonably high prices. The Commission's interpretation of the statute prevents the Postal Service from evading the price cap by shifting mailpieces to higher rates through manipulation of its mail preparation requirements. The Commission's interpretation is therefore consistent with the price cap's language and purpose, and the Commission's delegated authority to administer the cap.

The Postal Service's arguments to the contrary are unavailing. Its plain language argument, as demonstrated above, simply does not fit the terms of the statute. The Postal Service attempts to bolster its reading of the statute by pointing out that the statute refers to "the Postal Service fil[ing] notice of its intention to increase rates." *Id.* The Postal Service argues that this provision clarifies that "rates" therefore means only those rates for which the Postal Service must file notice. The Postal Service then argues that it is not required to file notice of its mail preparation requirement changes, and therefore "changes in rates" should not be considered to encompass mail preparation requirement changes. But this argument begs the question: If the Commission's interpretation of the statute is correct, the Postal Service may, indeed, have to file a notice with the Commission when it makes certain mail preparation requirement changes that result in mailpieces being charged higher prices. That is in part the question at issue in this case. Therefore the "filing" language identified by the Postal Service clarifies no ambiguity about whether changes in rates encompass both changes to the posted rates and changes to rates brought about through the modification of the Postal Service's classification system.

Nor are we convinced by the Postal Service's observation that the Act sometimes distinguishes between "rates" and "classifications," which the Postal Service argues requires the conclusion that a change in rates cannot be the same thing as a change in classification. *See, e.g.*, *id.* § 3622(d)(1) (creating requirements for a system for regulating "rates and classes"). This argument ignores the fact that the Commission is not stating that changes in classifications are themselves changes in rates; rather, the Commission merely points out the self-evident fact that changes in classifications can *cause* changes in the rates experienced by mailers, a point the Postal Service does not dispute. It is those changes in rates paid by mailers that the Commission seeks to regulate, whether they occur through the posting of new prices to a list or through changes in classification.

In short, the Postal Service has failed to show that "Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, or that Congress has precluded the Commission's interpretation of the statute. The statute therefore leaves a gap to be filled by the Commission pursuant to its delegated authority to regulate rates and classes for market-dominant products.

Nor can the Postal Service show that the Commission's price cap authority over mail preparation changes is constrained by regulation. The regulations governing classification changes are also ambiguous as to whether they cover mail preparation requirement changes outside the Mail Classification Schedule. The relevant regulation reads,

> The Postal Service shall make reasonable adjustments to the billing determinants [i.e., volume levels] to account for the effects of classification changes such as the introduction, deletion, or redefinition of rate cells.

39 C.F.R. § 3010.23(d)(2). Nothing in the plain language of the regulation forbids the Commission from considering whether mail preparation requirement changes such as those in the Manual "redefine" a rate cell. As the Postal Service concedes, operational changes in the Manual can define and redefine the "eligibility" for a rate cell. The regulation is silent as to whether redefining the eligibility for a rate cell – in other words, defining which mailpieces can fit into that rate cell – is a redefinition of the rate cell itself. Certainly, however, the regulation does not foreclose the Commission's interpretation, and we are bound to defer to that interpretation unless it is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512 (internal quotation mark omitted).

We are not convinced by either of the Postal Service's arguments attempting to limit the scope of this regulation. First, the Postal Service argues that "classification changes" in the regulation refers only to changes made to the official Mail Classification Schedule (which establishes rates for mail services), not changes made to the Postal Service's operational Manual (which sets mail preparation requirements). But nothing in the language of the regulation limits its scope to classification changes contained in the Schedule. On the other hand, changes in the Manual that reclassify a mailpiece from one product or rate cell to another fall comfortably within the plain meaning of the phrase "classification changes."

The Postal Service has provided no principled reason, originating in the statute or regulations, for why the price cap should treat classification changes in the Manual differently than classification changes in the Schedule when either change can cause a change in the rates paid by mailers. The

regulation is therefore ambiguous and does not preclude the Commission's reasonable assertion of authority over some mail preparation requirement changes with rate effects.

The Postal Service's final argument regarding the interpretation of the regulation is that the Commission's reading of "classification changes" as extending beyond the Mail Classification Schedule would wreak havoc with the Postal Service's ratemaking by requiring it to count "*[a]ny* mail-preparation requirement" as a classification change that may change rates. Br. of U.S. Postal Serv. 41. The Postal Service is certainly correct that the implications of the Commission's interpretation of its authority are potentially staggering. Nonetheless, this does not change the fact that, in regulating the price cap, the Commission has *some* authority to take account of operational rules that have rate effects. This does not mean that the Commission has unfettered authority. Any regulatory approach must be a product of reasoned decisionmaking. We now turn to this issue.

**B.** *The Commission's Decision Is Arbitrary and Capricious*

As noted above, the statute and regulations do not foreclose the Commission's claim that, in regulating the inflation-based price cap, it has some authority to assess mail preparation requirements that have rate effects. However, the Commission's Order in this case fails under arbitrary and capricious review. "Put simply, the [Administrative Procedure Act] requires that an agency's exercise of its statutory authority be reasonable and reasonably explained." *Mfrs. Ry. Co.*, 676 F.3d at 1096. The agency fails to reasonably explain its decision if it gives "differential treatment of seemingly like cases." *LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 232 (D.C. Cir. 2011). And we owe no

deference to an agency determination that is "largely incomprehensible." *Coburn v. McHugh*, 679 F.3d 924, 926 (D.C. Cir. 2012).

At its core, the Commission's Order is arbitrary and capricious because it fails to articulate a comprehensible standard for the circumstances in which a change to mail preparation requirements such as the one in this case will be considered a "change in rates." The failing is particularly concerning because the Commission acknowledges that its interpretation of its authority could have broad consequences for the Postal Service, theoretically allowing the Commission to superintend not only the changes in posted rates listed in the Mail Classification Schedule, but also any of the myriad operational changes that reclassify mailpieces and have "rate effects." The Commission does not claim this unbridled authority. Indeed, the Commission concedes that it has a responsibility to provide "clear guidance to the Postal Service and its customers about the scope and contours of the price cap requirements." Order on Price Adjustments at 15. In response to the Postal Service's concern that the Commission's reasoning would lead it to deem all mail preparation requirements to be changes in rates, the Commission sought to reassure the Postal Service with these words: "The Commission has not and will not indiscriminately treat all new mail preparation requirements as rate adjustments." *Id.* at 25. Unfortunately, the Commission's decision fails to set forth a standard that will ensure that this promise is kept.

In attempting to define which operational changes would count as rate adjustments, the Commission is cryptic, to say the least. It says that a change in rates occurs when the mail preparation requirement change at issue "require[s] mailers to alter a basic characteristic of a mailing in order for the

mailing to qualify for the same rate category for which it was eligible before the change in requirements." *Id.* at 18. This purported standard does not come close to satisfying the requirement of reasoned decisionmaking, most notably because the reference to a "basic characteristic of a mailing" has no content and is not accompanied by an adequate explanation of how the standard applies to the facts of this case. As a consequence, the purported standard is indiscriminate and offers no meaningful guidance to the Postal Service or its customers on how to treat future changes to mail preparation requirements. Indeed, the Commission's application of the standard in this case appears to be inconsistent and inadequately explained.

In the same Order that determined that the revised Intelligent Mail requirements constituted "changes in rates," the Commission considered whether another change in "preparation requirements constitute[d] a price change." Order on Price Adjustments at 71. The second operational change involved the Postal Service's rules for preparing flat-shaped mailpieces for shipment. Previously, the Postal Service had recommended that certain flat-shaped mailpieces be stacked in bundles of equal height so that they could more efficiently interact with the sequencing machines used by the Postal Service. In its notice of rate adjustment, however, the Postal Service proposed making the "bundling" rule mandatory for such flat-shaped mailpieces to qualify for certain rates. By making the "bundling" rule mandatory, the Commission acknowledged that "the new preparation requirements may result in some mailers paying higher prices" because those mailers who did not change their shipping methods would be forced into a higher rate cell. *Id.* Nevertheless, the Commission concluded that these operational changes do not count as changes in rates because

the requirements "do not change the basic characteristics of a mailing." *Id.* This is hard to fathom.

The Commission's attempt to explain the differences between the bundling rule and the Intelligent Mail change does not withstand scrutiny. In considering the Intelligent Mail change, the Commission stated that the requirement "change[d] the basic characteristics of a mailing" because it "compel[led] mailers to change their mailing practices in order to qualify for the same rates they currently qualify for." *Id.* at 30. This is precisely what the bundling rule requires. Yet the Commission ruled that the rate effects of the bundling rule do not count in assessing the inflation-based price cap.

The Commission never satisfactorily explains why one change in mailing practices alters "a basic characteristic of a mailing" while the other does not. Nor is it obvious or intuitively clear why putting a barcode on a mailpiece is different from moving an address label or changing the bundling configuration of mailpieces, both of which the Commission has said would not constitute changes to a basic characteristic of mailpieces. *Id.* at 72.

The Commission relies on a factually contested point that one change is greater in magnitude than the other, with barcoding requiring "significant" changes, *id.* at 29, while bundling requires "minor modifications," *id.* at 72. But, even accepting this as true, it is unclear from the Commission's decision why the size of the change determines the "type" of the change – i.e., why a small change that admittedly affects rates is not a "change in rates." It is likewise unclear why the magnitude of the change determines whether the change affects "a basic characteristic of a mailing."

The Commission's brief to this court belatedly asserts that "trivial preparation changes are the most likely to have virtually universal adoption by mailers" and therefore may not actually change rates paid by mailers. Br. for the Postal Regulatory Comm'n 42. This claim is nowhere to be found in the Commission's decision. Therefore, "whatever the merits of this position, we cannot consider it because the Commission did not set it forth below." *LePage's 2000, Inc.*, 642 F.3d at 231. Furthermore, the assertion cannot be squared with the Commission's rule that the Postal Service may not rely on forecasts of mailer behavior.

Neither the Commission's unelaborated "basic characteristic" standard nor its application here effectively explains the Commission's reasoning or resolves the ambiguity about the treatment under the price cap of future mail preparation requirement changes. As the Commission itself has noted, indiscriminately treating mail preparation requirement changes as rate changes could have far-reaching and enormous consequences for the day-to-day and month-to-month operations of the Postal Service, including its ability to reasonably manage its own policies. While the Commission may well be able to determine a basis for treating the Intelligent Mail rule and the bundling rule differently, it has not enunciated that basis in this case or provided guidance for future cases. "At the least, the Commission must explain this differential treatment of seemingly like cases," and "explain how it can read the same evidence differently when applied" to apparently similar changes. *Id.* at 232.

Although the Commission may have the authority under the price cap statute and regulations to consider mail preparation requirement changes of the kind at issue in this case as changes in rates, its decision here "must be remanded because of a basic inconsistency in its reasoning." *Air Line*

*Pilots Ass'n v. FAA*, 3 F.3d 449, 453 (D.C. Cir. 1993). During oral argument, counsel for the Commission argued that the Commission's decision is "rulemaking through adjudication," as if to suggest that it is not subject to serious scrutiny. The case law surely does not support this view.

> [T]he arbitrary and capricious standard governs review of *all* proceedings that are subject to challenge under the APA. Thus, if an action is subject to review under the APA, it does not matter whether it is a formal or informal adjudication or a formal or informal rulemaking proceeding – all are subject to arbitrary and capricious review under Section 706(2)(A).

EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW 203 (2d ed. 2013) (citation omitted); *see also Allentown Mack*, 522 U.S. at 374 ("[A]djudication is subject to the requirement of reasoned decisionmaking as well.").

We have previously remanded adjudications to the Commission when we have found "that the Commission acted within its statutory authority" but "the Commission's explanatory gap [was] palpable" with respect to its "inconsistent" application of its rules or "the bounds of its authority." *USPS*, 676 F.3d at 1106–08; *see also LePage's 2000, Inc.*, 642 F.3d at 234 (remanding to allow the Commission to explain the "inconsistencies in its order"); *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994) (discussing the authority of courts to "remand to the agency for a more complete explanation of a troubling aspect of the agency's decision" in an adjudication); *Plumbers and Steamfitters Local 342 v. NLRB*, 598 F.2d 216, 217 (D.C. Cir. 1979) ("[W]e remand to the NLRB to clarify its decision."). Given the noted deficiencies in the Commission's decision in this case, we have no choice but to remand.

\* \* \* \*

We find no merit in the Postal Service's other arguments, including its objection to the Commission's application of the historical-volume rule in this case, so we deny the petition for review with respect to these matters.

### III. CONCLUSION

For the reasons given above, we deny the petition for review in part and grant in part. We hold that the price cap statute and the applicable regulations do not entirely foreclose the Commission from determining that some mail preparation requirements constitute "changes in rates." We also hold, however, that the Commission's decision in this case is arbitrary and capricious for lack of reasoned decisionmaking. We therefore remand the case to the Commission to enunciate an intelligible standard and then reconsider its decision in light of that standard. Because the changes to the Manual should continue to be held in abeyance pending the outcome of the remand, it is unnecessary for us to vacate the Commission's decision.

*So ordered.*