# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 5, 2009                    Decided June 12, 2009

No. 08-1256

SECURITIES AND EXCHANGE COMMISSION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

NATIONAL TREASURY EMPLOYEES UNION,
INTERVENOR

———

Consolidated with 08-1294

———

On Petition for Review and Cross-Application for
Enforcement of a Decision and Order
of the Federal Labor Relations Authority

———

*Samuel M. Forstein*, Assistant General Counsel, Securities
& Exchange Commission, argued the cause for petitioner. With
him on the briefs were *Andrew N. Vollmer*, Acting General
Counsel, and *Rufus Beatty*, Senior Special Counsel. *Richard M.
Humes*, Associate General Counsel, entered an appearance.

*James F. Blandford*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief were *Rosa M. Koppel*, Solicitor, and *William R. Tobey*, Deputy Solicitor.

*Barbara A. Sheehy* argued the cause for intervenor. With her on the brief were *Gregory O'Duden* and *Elaine Kaplan*. *Barbara A. Atkin* entered an appearance.

Before: GINSBURG, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

BROWN, *Circuit Judge*: This is the sort of dispute that could only arise between public employees and a governmental agency. The Securities and Exchange Commission (SEC or Agency) was eager to pay its employees more money. The National Treasury Employees Union (NTEU or Union) complains the SEC implemented the raises too quickly. The Federal Labor Relations Authority (FLRA or Authority) agrees with the Union and has ordered the SEC to provide back pay to atone for the affront. Counterintuitive though it may be, we agree the FLRA has properly resolved this odd controversy so we deny the petition for review and grant the Authority's cross-application for enforcement.

## I.

This is what happened. After years of struggling with high attrition from the ranks of its professional employees (attorneys, accountants, and examiners), the SEC began focusing on pay disparities between itself and other financial regulatory

agencies, such as the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision. Since 1989, these other agencies had been authorized to determine their own compensation and benefit levels without regard to the General Schedule, which continued to define pay grades for SEC employees. Although the SEC took advantage of as many compensation and benefit flexibilities as existing law allowed, including special pay rates for its most sought-after employees, by 2001—with its workload increasing dramatically and staffing shortages reaching crisis levels—the Agency sought legislative relief. Congress acquiesced. On January 16, 2002, it passed the Investor and Capital Markets Fee Relief Act, Pub. L. No. 107-123, 115 Stat. 2390 (2002), which gave the SEC authority to set and adjust its employees' pay rates without regard to the General Schedule.

Both the Union and SEC management had eagerly anticipated the passage of this Act. The Union signaled the very next day, January 17, its willingness to begin bargaining. By March 6, the Agency had submitted its Implementation Plan to Congress and, on April 10, the Agency convened initial discussions with the Union. On April 18, SEC Chairman Pitt sent out an email to all employees stating the SEC hoped to implement the new system on May 19. Formal bargaining began April 22. Negotiations reached an impasse and the Union filed for assistance with the Federal Services Impasse Panel (Panel) on May 15. The SEC and the Union were unable to break the impasse when they met again on May 16 and 17, at which point management notified employees that it would unilaterally implement the SEC's proposed pay plan effective May 19. The raises became effective as of May 19, but the actual increased paychecks did not begin to arrive until August.

On November 8, 2002 the Panel resolved the bargaining impasse, ordering adoption of the SEC's proposal with only slight modifications. On November 18, the NTEU filed two unfair labor practice charges, alleging the SEC violated Sections 7116(a)(1) and (5) of the Federal Service Labor-Management Relations Statute (the Statute) by unilaterally implementing the new pay plan and ending automatic annual within-grade increases (known as WIGIs) before the completion of the bargaining process. The General Counsel filed a complaint and, after a full evidentiary hearing, the ALJ found the SEC had violated the Statute. The ALJ awarded retroactive within-grade increases to employees who were entitled to them between May 19 and November 8, and ordered the SEC to recalculate those employees' placement on the new pay schedule taking such within-grade increases into account. The Authority concluded the record fully supported the ALJ's findings and that the recommended remedy was not contrary to the Back Pay Act, 5 U.S.C. § 5596.

The SEC petitions for review; the Authority cross appeals for enforcement of its order.

## II.

We review the FLRA's conclusion that the SEC engaged in an unfair labor practice under the familiar arbitrary and capricious standard; we determine only whether the FLRA has "offered a rational explanation for its decision, whether its decision is based on consideration of the relevant factors, and whether the decision is adequately supported by the facts found." *Nat'l Ass'n of Gov't Employees, Local R5-136 v. FLRA*, 363 F.3d 468, 474–75 (D.C. Cir. 2004) (citing, *inter alia*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The FLRA's conclusion that the SEC engaged in an unfair labor practice was neither arbitrary nor capricious.  As a preliminary matter, we reject the SEC's claim it is entitled to deference from the FLRA with respect to its chosen affirmative defense, that the unilateral implementation of the new salary system was necessary to the functioning of the agency.  The SEC concedes it can cite no authority in support of its request. We conclude any deference to the SEC would be inconsistent with the defense being an affirmative one; in this matter the SEC is not an agency entitled to deference, but rather appears as an employer.  Indeed, under the arbitrary and capricious standard of review that governs, it is the FLRA that receives deference when we review petitions challenging its conclusions under the Federal Service Labor-Management Relations Statute. *See, e.g., HHS Family Support Admin. v. FLRA*, 920 F.2d 45, 48 (D.C. Cir. 1990) ("[W]e must defer to the FLRA's interpretation of its own statute as against competing executive branch determinations.") (citing cases).

The SEC simply failed to meet its burden to prove its chosen affirmative defense—that the unilateral implementation of the new salary system on May 19, 2002 was necessary to the functioning of the agency—by a preponderance of the evidence.  As the Authority has explained before, the rule governing this affirmative defense is that, pending the completion of the mandatory bargaining process:

> [T]he status quo must be maintained to the maximum extent possible, that is, to the extent consistent with the necessary functioning of the agency.  When an agency chooses to avail itself of this exception and thus to alter the status quo, it must be prepared to provide affirmative support for the assertion that the action taken was consistent with the necessary functioning of the agency if its actions were subsequently contested in

an unfair labor practice proceeding. The Authority has also indicated that the phrase, "consistent with the necessary functioning of the agency," may be accurately paraphrased as "necessary for the [agency] to perform its mission."

*Def. Logistics Agency Def. Indus. Plan Equip. Ctr. Memphis Tennessee*, 44 F.L.R.A. 599, 616–17 (1992) (citing *Dept of Justice, U.S. Immigration & Naturalization Serv., U.S. Border Patrol, Laredo, Texas*, 23 F.L.R.A. 90, 90 (1986)) (internal citations, footnotes and quotations omitted).

The SEC complains the FLRA purported to apply a mere preponderance burden of proof in determining whether the Commission sustained its affirmative defense, but effectively imposed a much more demanding one. In context, though, it seems clear the ALJ was describing the affirmative defense itself as demanding, not the employing agency's burden. From the Commission's point of view, this may be a distinction without a difference. Consider, however, that while the prosecution in a criminal case always bears the burden of proving the elements of a crime beyond a reasonable doubt, the substantive content of the elements to be proven may vary; for example, from a reckless state of mind to a knowing and intentional one. While the *burden* is the same, the *standard itself* is different, and it is easier for a litigant to prove some than others.

To successfully invoke the "necessary functioning" exception, an agency must show the change is a response to "an overriding exigency" or similarly compelling need. *22 Combat Support Group (SAC) March Air Force Base, California*, 25 F.L.R.A. 289, 301 (1987) ("While the matter was obviously important, I do not conclude it was so critical as to create an overriding exigency or other compelling reason which would

justify adhering to the January 13 implementation date ….").
For example, in one case the Authority rejected the defense
because it did not appear that the agency "was in acute danger
of being unable to perform its function without" the unilateral
implementation of the change at issue. *Def. Logistics Agency
Def. Indus. Plan Equip. Ctr. Memphis Tennessee*, 44 F.L.R.A.
at 617. The SEC observes that a public agency will rarely face
an exigency that threatens its ability to function. But that is
only to say the "necessary functioning" exception will never be
the rule. Exigency still has a role to play in determining
whether the unilateral implementation of a management
proposal is properly exempted from statutory requirements. At
the very least, the proponent of the necessary functioning
defense must establish that the change was necessary for the
agency to effectively perform its mission and that it was
necessary to make the change at the time it was made.
*Immigration & Naturalization Serv.*, 55 F.L.R.A. 892, 904
(1999) ("Respondent has failed to establish that it was
'necessary' for it to implement the changes … prior to satisfying
its bargaining obligation."). As the SEC fails to appreciate,
there is a difference between what an agency finds expedient
and what is necessitated by an "overriding exigency."

The administrative law judge (ALJ), whose decision was
adopted by the Authority, carefully went through the evidence
presented, analyzed the parties' arguments, and explained his
findings and conclusions. There is "a reasoned path from the
facts and considerations before the [agency] to the decision it
reached." *NTEU v. FLRA*, 466 F.3d 1079, 1081 (D.C. Cir.
2006). The ALJ acknowledged the Agency "was losing key
employees at an alarming and dangerous rate" and needed to act
quickly to reduce attrition by increasing compensation. But, as
the ALJ observed, and as the Authority confirmed,
"management must demonstrate not merely that the <u>change</u> is
necessary to its effective functioning, but also that <u>delaying</u>

implementation until after the impasse is resolved would undermine the effective functioning of the agency." While the SEC makes a good argument that it urgently needed to recruit new staff and discourage defections from current employees, it failed to persuade the administrative law judge, the FLRA, and ultimately this court that its unilateral implementation of a new pay system *on May 19, 2002*—rather than after the completion of the required bargaining process—was necessary for the agency to perform its mission. As in previous cases in which this defense has not been satisfied, here "the record reflects that the reasons for the change were of long-standing origin and were merely desirable, rather than being essential or necessary to the functioning of the agency." *Def. Logistics Agency Def. Indus. Plan Equip. Ctr. Memphis Tennessee*, 44 F.L.R.A. at 618 (quotations and citations omitted).

The SEC also challenges two of the FLRA's factual findings. The Authority's findings of fact are "conclusive" if "supported by substantial evidence on the record considered as a whole." 5 U.S.C. § 7123(c). "This standard requires us to defer to the Authority's factual determinations if, taking into account any record evidence to the contrary, the record contains such relevant evidence as a reasonable mind might accept as adequate to support such determinations." *Nat'l Ass'n of Gov't Employees, Local R5-136*, 363 F.3d at 475 (quotations and citations omitted). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966); *see also Domestic Sec. Inc. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003).

The SEC has not shown that the challenged findings of fact fail under this deferential standard. The SEC first challenges

the FLRA's finding that the Executive Director's testimony "directly contradicts the [SEC's] claim that implementation of the pay system on May 19 was necessary to assure funding." The SEC points to testimony suggesting that if the $25 million reprogrammed by the Office of Management and Budget was not legally obligated in FY 2002, the money might be used for something else. The FLRA draws our attention to other testimony showing that money would likely be available to pay for the raises, either from the reprogrammed funds or the Agency's regular appropriation process. The SEC also challenges the FLRA's finding that the employees did not receive the salary increases until August and that this delay weakened the SEC's argument that implementation in May, rather than waiting for the Panel decision, was necessary to the functioning of the Agency. With respect to each of these findings, there was conflicting evidence in the record. The ALJ addressed the evidence in his decision, carefully describing contradictions and making credibility determinations. Such credibility determinations are almost never disturbed on appeal, and there is no reason to do so in this case.

## III.

We review the FLRA's ordered remedy under the Back Pay Act *de novo*, *SSA v. FLRA*, 201 F.3d 465, 471 (D.C. Cir. 2000), and let it stand. To be entitled to an award of back pay, "1) the employee must have been affected by an unjustified or unwarranted personnel action; 2) the employee must have suffered a withdrawal or reduction of all or part of his pay, allowances, or differentials; and 3) but for the action, the employee would not have experienced the withdrawal or reduction." *Id.* at 468.

Under our precedent, back pay may be awarded if a mandatory salary upgrade was denied to an employee because

of an unwarranted personnel action; loss of such a mandatory upgrade meets the "withdrawal or reduction" element of the Back Pay Act. *Brown v. Sec'y of the Army*, 918 F.2d 214, 220 (D.C. Cir. 1990). As we described our conclusion in *Brown*, "we comprehend the 1978 Back Pay Act definitional amendment to mean that if an upgrade is mandatory once specified conditions are met, the Act now affords a retrospective remedy. If an upgrade is not of that virtually automatic, noncompetitive kind, the Act affords no relief. Only in the former case will the employee be treated as one already 'duly appointed' to the higher position, so that the failure to confer the benefit constitutes a 'withdrawal or reduction' in compensation." *Id.* This conclusion controls the outcome of this case because the within-grade increases were virtually automatic and non-competitive.

The SEC's final argument is that awarding back pay may give some employees an undue windfall. But any factual questions—such as whether any of the employees who were due a within-grade increase between May 19, 2002 and November 8, 2002 would actually have received higher pay under the new system had the SEC not implemented the change before the bargaining process was complete, and by how much—can be resolved in compliance proceedings.

IV.

The petition for review is denied and the cross-application for enforcement is granted.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring: I join the opinion of the Court. I write separately to point out the constitutional oddity of a case pitting two agencies in the Executive Branch against one another, and to explain why the Court can hear this dispute.

The caption of this case – *Securities and Exchange Commission v. Federal Labor Relations Authority* – illustrates an anomaly. Both the SEC and the FLRA are agencies in the Executive Branch, yet one is suing the other in an Article III court. This state of affairs is in tension with the constitutional structure designed by the Framers and set forth in the text of the Constitution. The Constitution vests the "executive Power" in one President. U.S. CONST. art. II, § 1, cl. 1. And the Constitution assigns the President the responsibility to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. Because Article II provides that a single President controls the Executive Branch, legal or policy disputes between two Executive Branch agencies are typically resolved by the President or his designee – without judicial intervention. *See, e.g.*, Exec. Order No. 12,146, 44 Fed. Reg. 42,657 (July 18, 1979) (providing for review of certain inter-agency legal disputes by the Attorney General). Moreover, because agencies involved in intra-Executive Branch disputes are not adverse to one another (rather, they are both subordinate parts of a single organization headed by one CEO), such disputes do not appear to constitute a case or controversy for purposes of Article III. *See* U.S. CONST. art. III, § 2; *see generally* Michael Herz, *United States v. United States: When Can the Federal Government Sue Itself?*, 32 WM. & MARY L. REV. 893 (1991). In short, judicial resolution of intra-Executive disputes is questionable under both Article II and Article III.

This analysis is uncontroversial as applied to disputes between two traditional Executive Branch agencies. No one plausibly thinks, for example, that a federal court would

resolve a dispute between the Department of Justice and, say, the Department of Defense or the Department of State.

But the wrinkle is that this case involves a so-called independent agency. Independent agencies are those agencies whose heads cannot be removed by the President except for cause and that therefore typically operate with some (undefined) degree of substantive autonomy from the President in a kind of extra-constitutional Fourth Branch. In *Humphrey's Executor v. United States*, the Supreme Court approved of independent agencies, at least in certain circumstances. 295 U.S. 602 (1935); *see also Morrison v. Olson*, 487 U.S. 654, 689-91 (1988). Consistent with the post-*Humphrey's Executor* understanding that Presidents cannot (or at least do not) fully control independent agencies, and that an independent agency therefore can be sufficiently adverse to a traditional executive agency to create a justiciable case, the Supreme Court and this Court have entertained suits between an independent agency and a traditional executive agency, or as here between two independent agencies. *See, e.g.*, *Dep't of Treasury, IRS v. FLRA*, 494 U.S. 922 (1990); *United States v. Nixon*, 418 U.S. 683 (1974); *United States v. ICC*, 337 U.S. 426 (1949); *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998); *In re Sealed Case*, 146 F.3d 1031 (D.C. Cir. 1998) (Silberman, J., concurring in denial of rehearing en banc); *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997); *NLRB v. FLRA*, 2 F.3d 1190 (D.C. Cir. 1993); *United States v. FMC*, 694 F.2d 793, 796 (D.C. Cir. 1982); *see also Barnes v. Kline*, 759 F.2d 21, 41, 64 (D.C. Cir. 1985) (Bork, J., dissenting) (explaining *United States v. ICC*: "because the ICC is an independent agency, the President had no power to terminate the controversy by ordering the ICC to reverse its decision denying the government money damages"); William K. Kelley, *The Constitutional Dilemma of Litigation Under the Independent*

*Counsel System*, 83 MINN. L. REV. 1197, 1222 (1999) ("Assuming that it would not constitute good cause for removal if the head of an agency refused to follow the President's directions as to how to execute the law, the difference between executive and independent agencies thus seems to make all the difference.").

Our ability to decide this case thus follows from *Humphrey's Executor* and accords with courts' previous handling of disputes between an independent agency and a traditional executive agency (or another independent agency). Because this case is justiciable under the governing precedents and because the Court's analysis of the merits is persuasive, I join the opinion of the Court.