# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 5, 2018                    Decided April 6, 2018

No. 16-1284

UNITED STATES POSTAL SERVICE,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

NATIONAL POSTAL POLICY COUNCIL, ET AL.,
INTERVENORS

———

On Petition for Review of Orders
of the Postal Regulatory Commission

———

*David C. Belt*, Attorney, U.S. Postal Service, argued the cause and filed the briefs for petitioner. *Stephan J. Boardman*, Chief Counsel, U.S. Postal Service, entered an appearance.

*Dana Kaersvang*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Michael S. Raab*, Attorney, *David A. Trissell*, General Counsel, Postal Regulatory Commission, *Christopher J. Laver*, and *Erica A. Barker*, Attorneys.

Before: PILLARD, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Under the Postal Accountability and Enhancement Act, Pub. L. No. 109–435, 120 Stat. 3198 (2006), the Postal Regulatory Commission is authorized to set rate caps for the "market-dominant products" of the United States Postal Service. (The act contrasts such products, consisting most obviously of products where the Postal Service enjoys a legal monopoly, such as first-class mail, with the Postal Service's "competitive" products.) The Commission is to set "an annual limitation on the percentage changes in rates" equal to the rate of inflation, 39 U.S.C. § 3622(d)(1)(A); the statute defines "rates" as "fees for postal services," 39 U.S.C. § 102(7).

In *USPS v. Postal Regulatory Comm'n*, 785 F.3d 740 (D.C. Cir. 2015) ("*USPS I*"), we wrestled with the question of whether, and if so under what circumstances, the Commission could treat Postal Service changes in mail preparation requirements as "changes in rates" subject to the cap.

We rejected the Postal Service's theory that the statute encompassed "only changes to the official posted prices of each product," *id*. at 751, saying that "the Commission may have the authority under the price cap statute and regulations to consider mail preparation requirement changes of the kind at issue in this case as changes in rates," *id*. at 755. But, mystified by the Commission's efforts to explain how it would decide when a mailing requirement actually was a rate change, we found its action arbitrary and capricious and remanded to the Commission for it to "enunciate an intelligible standard and then reconsider its decision in light of that standard." *Id*. at 756.

In due course the Commission produced the order now before us, Order No. 3047, *Order Resolving Issues on Remand*

(Jan. 22, 2016). The order rules that a mail preparation change constitutes a change in rates if it results "in the deletion of a rate cell" *or* "in the redefinition of a rate cell if the mail preparation change causes a significant change to a basic characteristic of a mailing." *Id*. at 15.

Applying this standard, the Commission reaffirmed its earlier decision that the proposed mail preparation change constituted a change in rates. The Postal Service moved for reconsideration, which the Commission denied. Order No. 3441, *Order Resolving Motion for Reconsideration of Commission Order No. 3047* (July 7, 2016). The Postal Service again petitions for review.

We now find that the Commission's new analysis adds no discernible clarity to the reasoning it supplied on the last round and that it rests on an unreasonable interpretation of "changes in rates" that "goes beyond the meaning that the statute can bear." *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994). "[U]nder the familiar standard of *Chevron*, . . . a 'reasonable agency interpretation prevails'"; "[o]f course, 'if Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable.'" *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 222 (D.C. Cir. 2018) (quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009)). "Even under *Chevron*, after all, agencies only 'possess whatever degree of discretion [an] ambiguity allows.'" *Id*. at 224 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013)). We grant the petition and vacate the orders.

\* \* \*

Our 2015 decision recites the relevant background. See *USPS I*, 785 F.3d at 744–50. We cover the same ground only as necessary.

The Commission does not apply the rate cap by limiting the rate for each product in isolation. Rather, it allows the Postal Service to trade off above-inflation increases in the rate of one product with below-inflation increases in the rate of another product within the same class (or, of course, constant-dollar decreases in rates). As a result, apart from market-driven changes in volume, the Postal Service's aggregate revenue for each class of market-dominant products should increase no faster than inflation. We explained in *USPS I*:

> Thus, for example, the Commission's rules ensure that the Postal Service may not generate extra revenue beyond the price cap by taking advantage of the different volume levels of different products within a class to raise rates unevenly while technically complying with the class-level price cap. To achieve this, the Commission has promulgated regulations specifying that the calculation of a "change in rates" in a class should be weighted by the mail volume of any given rate cell in a class. 39 C.F.R. § 3010.23(b). So, if the Postal Service has two rate cells in a given class but one of them accounts for the lion's share of the mail volume, any increase in the rate for that rate cell will be weighted according to volume when determining its contribution toward the classwide rate change cap.

*Id.* at 745. (The Postal Service does not question this aspect of the Commission's work.) Thanks to this interrelation of rate cells, the Commission might have tried to integrate mail preparation requirements into its authority over "changes in rates" with the following argument: Where an increase in mail preparation requirements for one cell will *drive* mailers to use a *higher-priced cell*, the resulting increase in volume in the latter should count against the rate cap. This is emphatically not the road taken by the Commission. We identify this approach not in order to offer any final judgment on it but to

indicate how treating a change in mail preparation requirements as a rate change might, as a matter of arithmetic, be integrated with the Commission's system of volumetric assessment.

We now return to the history that has brought us here. As of 2009, the Postal Service had three rates for bulk mail (listed in descending order of price and ascending order of the related mailing requirement's stringency): (1) one for mail sent without a barcode (the "nonautomation" rate), (2) one for mail sent with either a POSTNET or Basic Intelligent Mail barcode (the "standard automation" rate), and (3) one for mail sent with a Full-Service Intelligent Mail barcode (the "discounted automation" rate).

In January 2013 the Postal Service disallowed use of the POSTNET barcode as a basis for obtaining the standard automation rate. *POSTNET Barcode Discontinuation*, 77 Fed. Reg. 26,185 (May 3, 2012). The Commission did not treat this change as a change in rates.

In April 2013 the Postal Service sought to make a further change: To qualify for the standard automation rate, mailers would have to upgrade their barcodes to the Full-Service Intelligent Mail variety, which would necessarily qualify them for the "discounted automation" rate as well. *Implementation of Full-Service Intelligent Mail Requirements for Automation Prices*, 78 Fed. Reg. 23,137 (Apr. 18, 2013). The Commission held this redefinition of requirements for the standard automation rate to be a change in rates. Order No. 1890, *Order on Price Adjustments for Market Dominant Products and Related Mail Classification Changes* (Nov. 21, 2013). Its explanation was that the barcode changes "require mailers to alter a basic characteristic of a mailing in order for the mailing to qualify for the same rate category for which it was eligible before the change in requirements." *Id*. at 18. It ruled that this change in mailing requirements, coupled with changes in

nominal rates that the Postal Service had earlier proposed, would in the aggregate violate the price cap. *Id.* at 35–37.

That ruling led to our decision in *USPS I*, to the Commission's new articulation of its theory and application of that theory against the Postal Service, and thus to the petition now before us.

* * *

Our 2015 decision laid down a marker for what might qualify as rates and "changes in rates." Time and again we tied "rates" to payments by mailers to the Postal Service, and "changes in rates" to changes in those payments. We started by pointing to the controlling statute's definition of "rates" as "fees for postal services." 39 U.S.C. § 102(7); *USPS I*, 785 F.3d at 751. We saw the central issue as being identification of the circumstances where "the Service changed mail preparation requirements that would have the likely effect of *changing rates paid by certain mailers for sending the same mailpieces* that they sent in the prior year." *USPS I*, 785 F.3d at 746 (emphasis added). We said that under the barcode changes mailers "who did not upgrade their systems to comply with the full-service requirements would have to pay the higher, undiscounted rates." *Id.* at 747. We framed the basic statutory issue as whether "changes in rates" encompassed not only changes in posted prices but "*also changes to the prices actually applied to particular mailpieces*, as the Commission argues." *Id.* at 751 (emphasis added). We saw the Commission as seeking to regulate "changes in rates paid by mailers." *Id.* at 752. And, since a change in posted prices and a change in mail preparation requirements "can cause a *change in the rates paid by mailers*," *id.* at 753 (emphasis added), we accepted the Commission's reading where the Postal Service failed to show anything in the statute or regulations requiring a distinction between those two types of changes, see *id.*

We note that *USPS I*'s link of rates to amounts paid to the provider is anything but unique. "The standard dictionary definition of the term 'rate' (as used with reference to prices) is '[a]n amount paid or charged for a good or service.'" *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 777 (2016) (quoting Black's Law Dictionary 1452 (10th ed. 2014)). It is "the amount of money a consumer will hand over in exchange for" a product or service. *Id.*

In 2015 we were baffled by the Commission's contrasting treatment of changes in bundling requirements for flat-shaped mailpieces. We noted its acknowledgement that the requirement "'may result in some mailers paying higher prices' because those mailers who did not change their shipping methods would be forced into a higher rate cell," but quoted the Commission as saying these changes "do not count as changes in rates because the requirements 'do not change the basic characteristics of a mailing.'" *USPS I*, 785 F.3d at 754. We observed, "This is hard to fathom." *Id.*

In its present order the Commission seems just as devoted to its previous murky notion of changes in "basic characteristics": Its new formula for finding whether a redefinition of a rate cell produces a change in rate turns on whether a change in mailing requirements "causes a significant change to a basic characteristic of a mailing." The Commission now defines a "basic characteristic of a mailing" as "what the mailer sends" and "how the mailer sends it," while measuring significance "by assessing the operational adjustments and/or costs required by the mailer for compliance with the new mail preparation requirement." Order No. 3047 at 15–17. This new verbiage, which the Commission offers with no effort to link the words to any clear concept of "changes in rates," can hardly be said to advance matters from its earlier reliance on "basic characteristics" simpliciter.

We need not devote more effort to evaluating the Commission's diminutive increase in clarity because its explanation suffers from a more fatal flaw: It seeks to expand the Commission's regulatory domain beyond any permissible meaning of "rates" under § 102(7) and "changes in rates" under § 3622. In *USPS I* we found the latter section "ambiguous" on the question whether "changes in rates" could mean something more than changes to posted rates. 785 F.3d at 751–52. But of course that ambiguity doesn't give the Commission carte blanche to treat anything as a change in rates. "[W]hile ambiguity in a statute may imply a 'delegat[ion] to the agency [of] the power to fill those gaps,' the agency must still stay within the bounds of the delegation in promulgating regulations under the statute." *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1177 (D.C. Cir. 2003) (quoting *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1016 (D.C. Cir. 1999)); see also *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013); *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659–60 (D.C. Cir. 2011).

We have already reviewed at length *USPS I*'s equation of rates with sums paid for a mailing. At no point did we suggest that a change in mailing requirements might qualify as a change in rates simply because it might change a mailer's aggregate cost for sending an item. The Commission offers no case holding "rate" or "change in rate" to encompass such costs or changes. No aspect of its new formulation even attempts to assess whether a mail preparation change, "significant" or not, will cause a mailer to pay more to the Postal Service.

Unlike the Commission, the Postal Service identifies circumstances where a change in mailing preparation costs would yield "a change in the rates paid by mailers," *USPS I*, 785 F.3d at 753:

> This is not to say that compliance costs are inherently irrelevant to the issue of prices paid. . . . If a mailer believes that a new mail-preparation requirement requires it to incur compliance costs that are higher than the costs associated with simply paying a higher rate, then a rational customer will not pay those costs and instead will pay the higher rate (or perhaps leave the mail entirely). If, on the other hand, the customer believes that the compliance costs are lower than the cost of paying higher rates, then the mailer will comply with the requirement and its mail volume will accordingly not shift from one rate category to another.

Reply Comments of the United States Postal Service, at 9 (Aug. 31, 2015); see also Motion for Reconsideration of Order No. 3047, at 11 (Feb. 22, 2016) ("The Commission, however, makes no attempt to explain why the magnitude of a mail preparation change is the proper basis for determining whether mailers will shift to paying higher rates.").

Curiously, the Commission recognized in briefing *USPS I* that a mail preparation requirement change would present mailers with a choice between compliance and non-compliance. See Resp. Br. at 16, *USPS I*, 785 F.3d 740 (D.C. Cir. 2015) (No. 13-1308) ("And those mailers who previously had used basic barcoding now had to choose between paying higher prices, or making processing changes that the Postal Service itself acknowledged would be 'significant.'"). Before us, however, it disclaims any obligation to take account of such choices.

Because the Commission blocked the Postal Service's proposed barcode change, we are able to examine mailer behavior under the rate structure existing at the time. It demonstrates the Commission's drastic implicit underestimate of mailer readiness to adopt the Postal Service's most costly

(for mailers) barcodes. At the time of its original proposal in 2013, 64% of all eligible bulk mail used the Full-Service Intelligent Mail barcode and therefore qualified for the discounted automation rate. The Commission calculated that the *entire* remaining 36%—the mail using only the Basic Intelligent Mail barcode—would necessarily pay higher rates if it had accepted the proposed change in standard automation eligibility requirements (requiring Full-Service Intelligent Mail barcodes). But just two years later (without the proposed changes taking effect and so far as appears with no other alteration of mailers' incentives), Full-Service barcode utilization jumped to over 88%. Put another way, barcoded mail *not* enjoying the most discounted rate fell from 36% to 12%. Had the Postal Service proceeded in the face of the Commission's ruling, it would have been docked over $855 million in price cap authority under the assumption that it would receive that amount in increased prices. The Service would never have seen any of it.

Because the rate cell "redefinition" aspect of the Commission's new theory makes no effort to single out mail preparation changes that induce mailers to shift to a higher-priced service, it goes beyond "the bounds of the delegation" identified in *USPS I*. *Aid Ass'n for Lutherans*, 321 F.3d at 1177.

The Commission's alternative—asking if a rate cell has been deleted—fares no better. First, there is no impermeable line between redefinitions and rate cell deletions. Nearly all redefinitions can be alternatively characterized as deletions. Take the facts of this case. Before the proposed barcode change, there were three rates. The Postal Service's new insistence on use of the Full-Service Intelligent Mail barcode for the standard automation rate could be seen as either redefining or deleting that rate. It redefined the rate in the sense of requiring the Full-Service barcode for mailings to qualify for

it. And it deleted the rate in the sense that no mail would henceforth be charged the standard automation rate: mailers would pay either the nonautomation rate or the discounted automation rate. We do not see how the semantics of labeling in any way saves the Commission's interpretation or ties it any more closely to the regulatory authority as defined by § 3622.

Further, the Commission's deletion theory eschews any measure of significance altogether. The redefinition concept attempted a measure of significance, but it used an absolute metric that focused solely on the magnitude of costs and was therefore of no value in predicting possible mailer migration to higher-priced products. The deletion concept goes further, making no attempt to measure significance at all.

In defense of both its redefinition and deletion formulae, the Commission offers two principal responses, neither of which alters our conclusion that its order has adopted a notion beyond the bounds of the relevant statutory phrase: "changes in rates."

The Commission first points to one of its regulations, 39 C.F.R. § 3010.23, which describes how the Commission will calculate the magnitude of a change in rate. That section, discussed at the outset of the opinion, weights any change in rates by the volume of mail for the product in question, and uses an assumption that volume is constant, deriving the data "from the most recent available 12 months." *Id*. § 3010.23(d)(1). Modifications to the volume inputs are permitted in some circumstances: "The Postal Service shall make reasonable adjustments to the [volume levels] to account for the effects of classification changes such as the introduction, deletion, or redefinition of rate cells." *Id*. § 3010.23(d)(2). "Whenever possible, adjustments shall be based on known mail characteristics or historical volume data, as opposed to forecasts of mailer behavior." *Id*. § 3010.23(d)(3).

The Commission effectively argues that if its order complies with its regulation, that is the end of the matter. The Commission reminds us that § 3010.23 speaks of deletions and redefinitions, and privileges "historical volume data" over "forecasts of mailer behavior" whenever "possible." Because the Commission asserts that the disputed barcode change is properly characterized as either a redefinition or a deletion, and because the Commission has adopted a test that avoids mailer forecasts, the Commission contends that it need not show anything further to establish that the barcode rule would effect a rate change.

The Commission's reliance on its regulation plainly cannot justify its giving the statutory "changes in rates" a meaning outside the range of genuine ambiguity. The Commission recognized as much in *USPS I*, observing, "[W]hether or not the Commission correctly interpreted its own regulations has no bearing on the separate question of whether the Commission correctly interpreted 39 U.S.C. § 3622(d)." Resp. Br. at 25, *USPS I*, 785 F.3d 740 (No. 13-1308). Further, the regulation does not seem relevant. Section 3010.23, titled "Calculation of percentage change in rates," appears designed simply to govern that process. The statutory question is how to identify when a mail preparation change can be deemed to effect a change in rates; the regulation answers a separate and subsequent question about how to calculate the magnitude of such a change.

It is true that we were called on to interpret § 3010.23(d) in our 2015 decision. *USPS I*, 785 F.3d at 752–53. The question we confronted was whether the regulation itself unambiguously barred the Commission's interpretation that "classification changes" could refer to mail preparation changes. *Id*. at 752. We held that it did not. But we did not say that the Commission could treat as a rate change every mail preparation change that could be somehow shoehorned into the

text of § 3010.23(d)(2). To the extent that in 2015 we affirmed the historical volume rule (i.e., the assumption, for purposes of calculating the extent of a rate change, that volume is constant based on the prior year's data), we did so in the context of the question of how to calculate a rate change—not in asking whether a rate change has occurred in the first instance. *Id.* at 756; Pet. Br. at 49–54, *USPS I*, 785 F.3d 740 (No. 13-1308); Resp. Br. at 33–40, *USPS I*, 785 F.3d 740 (No. 13-1308).

The Commission also contends that it would be infeasible to compare the costs of compliance with the rate increase a mailer would face if it failed to comply with a new requirement. We offer two responses. First, even if these practical concerns were valid, they couldn't trump a statutory limit. The Commission must first confine its oversight to "changes in rates" and then, within that realm, craft a workable standard. Looking solely to mailer costs (as the Commission would prefer), without comparing those costs to the additional payment a mailer would *avoid* by making the mail preparation change, is no basis for predicting that mailers will pay a higher rate. Second, it is unclear whether the calculation the Commission embraces (securing cost estimates from the mailers and pegging them as "significant" or not) is necessarily less onerous than comparing mailers' compliance costs with the offsetting rate benefit. If there is an advantage, it seems to lie mainly in the Commission's extravagant claim of discretion in pinning the "significant" tag on a number (here it relies on estimates of the one-time costs for "larger mailers" ranging from $400,000 to $3.25 million, without even saying which number makes the grade). The comparison required in order to ascertain mailer movement to a higher rate might be more complex, but mainly because the costs (however estimated) would have to be compared with a benchmark—the rate increment faced by mailers—that would be quite precise.

14

* * *

Our 2015 decision found that the Commission may have authority to treat some Postal Service changes in mail preparation requirements as changes in rates. But that potential authority depends on its articulating and applying a test consistent with the statute. Its present orders have failed to do so.

We grant the petition for review and vacate the Commission's orders.

*So ordered.*