# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 8, 2020            Decided June 30, 2020

No. 19-1155

UNITED STATES POSTAL SERVICE,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

ASSOCIATION FOR POSTAL COMMERCE,
INTERVENOR

———

On Petition for Review of an Order of the
Postal Regulatory Commission

———

*Stephan J. Boardman*, Attorney, United States Postal Service, argued the cause for petitioner. On the briefs were *Redding C. Cates* and *Morgan E. Rehrig,* Attorneys. *David C. Belt* entered an appearance.

*Dennis Fan*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Daniel Tenny*, Attorney, *David A. Trissell*, General Counsel, Postal Regulatory Commission, *Anne J. Siarnacki*, Deputy General Counsel, and *Lauren A. D'Agostino*, Attorney.

2

*Matthew D. Field* and *Ian D. Volner* were on the brief for intervenor Association for Postal Commerce in support of respondent.

*Daryl L. Joseffer*, *Michael B. Schon*, and *Ashley C. Parrish* were on the brief for *amicus curiae* Chamber of Commerce of the United States of America in support of respondent.

Before: ROGERS, GRIFFITH, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Circuit Judge* RAO.

GRIFFITH, *Circuit Judge*: When foreigners send mail to the United States by "Inbound Letter Post," they pay their local postal carrier, who bears the cost of delivering that mail to our shores. Inside the country, the Postal Service takes over. Although foreign carriers pay dues to the Postal Service to defray the cost of delivery, those dues—which were previously set largely by the Universal Postal Union (UPU), a component of the United Nations—have long undercompensated the Postal Service to the tune of hundreds of millions of dollars per year. Periodic Reporting Requirements, 83 Fed. Reg. 33,879, 33,883 (July 18, 2018). The Postal Regulatory Commission, which oversees the Postal Service's ratemaking, ordered disclosure of certain financial data related to Inbound Letter Post. The Commission hoped to facilitate public participation in discussions of possible reforms and to help the public understand why Inbound Letter Post was so unprofitable. Seeking to keep that data confidential, the Postal Service petitioned for review. Because we hold that the Commission reasonably ordered disclosure, we deny the petition.

3

I

The Postal Accountability and Enhancement Act requires the Postal Service to submit an annual compliance report to the Commission. 39 U.S.C. § 3652. The Postal Service may designate information in this report as confidential, *id.* §§ 410(c)(2), 3652(f)(1), and it bears the "burden of persuasion" that such materials "should be withheld" from the public, 39 C.F.R. § 3007.201(a). In deciding whether the Postal Service has met this burden, the Commission must "balance the nature and extent of the likely commercial injury to the Postal Service against the public interest in maintaining the financial transparency of a government establishment competing in commercial markets." 39 U.S.C. § 504(g)(3)(A).

After reviewing the Postal Service's 2018 compliance report, the Commission voted to disclose revenue, volume, cost, and contribution data for Inbound Letter Post. The Commission reasoned that the public had a "vital" interest in disclosure because Inbound Letter Post "threaten[ed] the financial integrity of the Postal Service." J.A. 649, 651. If foreign mailers didn't pay their fair share, the Postal Service would need to charge domestic mailers more or cannibalize profits from other ventures to make up the difference. Moreover, artificially low rates for Inbound Letter Post "distort[ed] competition" from domestic shipping companies. J.A. 625. Finally, releasing the data would facilitate public participation in discussions over how best to reform the payment structure for Inbound Letter Post. At the time, the UPU set the default rates that applied in the absence of any superseding international agreement. Because the UPU's rates failed to compensate the Postal Service, the President had announced that the United States would withdraw from the UPU unless the UPU allowed it to set its own rates.

As to commercial harm, the Commission asserted that the Postal Service had failed to "explain how competitors, suppliers, or anyone else would be able" to use the data "to identify opportunities to divert business from or extract more favorable terms in negotiations with the Postal Service." J.A. 664. Specifically, the Postal Service "[did] not explain how the aggregated historical data would be useful for a competitor in the rapidly evolving market." J.A. 669. And there were "too many unknown variables" for the data to help with "target[ing] specific customers or markets." *Id.* Finally, since the data was aggregated by the UPU's four country groups, it did not reveal country-specific information and thus would not be particularly useful to foreign nations negotiating with the United States for rates other than the UPU's default rates.

Two of the five Commissioners concurred in part and dissented in part. They would have disclosed revenue and volume data only, not cost and contribution data, fearing that competitors could use the latter to "undercut the Postal Service in pricing and service offerings" and that foreign nations could leverage this data to gain the upper hand in negotiations, especially if the United States left the UPU. J.A. 694. However, that "worst case scenario," J.A. 695, did not come to pass because after the Commission voted to disclose the data at issue in this case, the UPU agreed to let the United States set rates for "bulky" letters and small parcels weighing up to two kilograms, *see* Universal Postal Convention art. 28b (2019).

The Postal Service petitioned for review, and the Commission stayed release of the data pending our disposition. The Postal Service argues that the Commission misinterpreted the statutory balancing test and that its order was arbitrary and capricious. We have jurisdiction under 39 U.S.C. § 3663. We review the Commission's statutory interpretations under "the familiar standard of *Chevron*," *USPS v. Postal Regulatory*

*Comm'n* (*USPS II*), 886 F.3d 1253, 1255 (D.C. Cir. 2018) (internal quotation marks omitted), and its orders under the Administrative Procedure Act, *United Parcel Serv., Inc. v. Postal Regulatory Comm'n*, 890 F.3d 1053, 1060-61 (D.C. Cir. 2018).

II

We deny the petition for review. The Postal Service's statutory argument hinges on a misreading of the Act, and its arguments that the Commission's decision was arbitrary and capricious fail to overcome the deference we owe to the Commission's reasoned decisions.

A

The Act directs the Commission to consider the "public interest in maintaining the financial transparency of a government establishment competing in commercial markets." 39 U.S.C. § 504(g)(3)(A). Conceding that the Commission's interpretation of the Act is entitled to *Chevron* deference, the Postal Service nonetheless finds that interpretation unreasonable. *See* Oral Arg. Tr. 4:14-14:18, 6:25-7:2. Specifically, the Postal Service argues that the phrase "government establishment competing in commercial markets" limits the Commission's consideration of the public interest to "protecting against competitive abuse of a statutory monopoly or of some other incident of governmental status." USPS Br. 20. We disagree.

No such limitation appears in the text of the statute, and as the Commission explained, financial losses to a government establishment such as the Postal Service burden the public. Surely, the public has an interest in understanding why a government establishment is hemorrhaging hundreds of

millions of dollars per year. After all, artificially low prices can distort domestic competition and result in Americans paying more than they should for other mail products.

Finding no support in the text, the Postal Service turns to the legislative history. Noting that a draft version of the Act did not include the phrase "competing in commercial markets," the Postal Service argues that its later insertion worked to narrow the Commission's consideration of the public interest. USPS Br. 21 (citing H.R. REP. NO. 109-66, pt. 1, at 25 (2005)). Perhaps, but it does not follow that Congress intended to cabin the "public interest" to nothing more than *preventing government abuse*. If it had intended such a significant limitation to the oft-invoked concept of "the public interest," Congress could have easily used those words. The Postal Service also points to a statement in the Senate Report that disclosure should not "serve as an unlimited opportunity to access any and all Postal Service data including that which may be, at best, tangentially-related to evaluating compliance with the [Act's] rate and service provisions." S. REP. NO. 108-318, at 20 (2004). But the Postal Service does not suggest that the data in this case is merely "tangentially" related to compliance, because it cannot. The data is clearly related to the Act's directive that the Commission review the Postal Service's finances to ensure revenues cover costs. *See* 39 U.S.C. § 3622(b)(5), (c)(2); *id.* § 3633(a)(2). And if anything, the legislative history bolsters the Commission's understanding of the public interest. The Act "guarantees a higher degree of transparency" than prior legislation to "ensure fair treatment" of customers and competitors. *USPS II*, 886 F.3d at 1263 (quoting S. REP. NO. 108-318, at 1); *see also* H.R. REP. NO. 109-66, pt. 1, at 46 ("[T]he Postal Service must be subject to a high degree of transparency, including in its finances and operations.").

Shifting to prudential arguments, the Postal Service objects that under the Commission's view the "balance [will] always tilt toward disclosure," USPS Reply 7, preventing the Postal Service from competing with private carriers as Congress intended, USPS Br. 21 (citing S. REP. NO. 108-318, at 15). We disagree. Even under the Commission's broader interpretation, a specific risk of commercial harm should outweigh general curiosity about the Postal Service's finances. The Postal Service also faults the Commission for relying on the "degree to which members of the public have lobbied for publication." *Id*. at 23. But it is reasonable for the Commission to consider the extent to which commenters have expressed an interest in disclosure, and indeed, the Administrative Procedure Act requires the Commission to address significant public comments. *See Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992).

Finally, the Postal Service argues that even if the Act can be read as broadly as the Commission suggests, the Commission never defined "public interest" and its lawyers may not do so now. USPS Reply 8; *see also SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 95 (1943). But phrases like "the public interest" are inherently open-ended, and the Commission need not articulate precise and comprehensive definitions before applying them. It is enough for the Commission to explain why the public interest would be served by disclosure, as it did here.

B

The Postal Service argues that the Commission's reasoning was arbitrary and capricious in that it failed: (1) to "properly take into account the substantial risks of commercial harm"; (2) to "respond to the dissenting opinions of two Commissioners"; and (3) to "provide a meaningful standard for

when Postal Service confidential submissions can remain under seal." USPS Br. 23. None of these arguments is persuasive.

1

The Postal Service's core objection is that the Commission gave short shrift to the risk of commercial harm from disclosure relative to the public interest in disclosure. But "[o]ur review of agency decisions based on multi-factor balancing tests . . . is necessarily quite limited. We may not merely substitute the balance we would strike for that the agency reached." *USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1263 (D.C. Cir. 1992).

The Postal Service claims that the data is more detailed than the Commission admits and that its release will be useful to domestic competitors and to foreign nations negotiating for better prices. Although the data is aggregated into four country groups, the Postal Service hazards that competitors and foreign nations may be able to divine *country-specific* information for countries that are outsized suppliers of mail. But the Commission reasonably concluded that "the UPU country groups are too broad and diverse to allow participants to infer [country]-specific data." J.A. 667. Each group includes at least 34 countries or territories, spanning multiple continents. Even if individuals knew that one country dominated its group, they wouldn't know its exact share of the market. J.A. 665-68; *see also Mudge Rose Guthrie Alexander & Ferdon v. U.S. Int'l Trade Comm'n*, 846 F.2d 1527, 1531 (D.C. Cir. 1988) (reasoning that even in industries "dominated by one or two firms," industry data does not "necessarily" reveal firm-specific data). And of course, that market share might change with the UPU's new rate structure.

The Postal Service also asserts that the Commission failed to adequately consider the risk of harm from increased competition. The Postal Service fears that its domestic competitors could use the data to target its most lucrative markets and underbid it. But again, the Commission reasonably concluded that "there [were] too many unknown variables" for the data to be useful to competitors hoping to undercut the Postal Service. J.A. 669. The data is not "disaggregated by cost segment or even by leg (processing, transportation, and delivery)," and it does not disclose details that bear on cost, such as where each letter originated, whether it was sent by air or by surface, and where it was ultimately delivered. J.A. 670 (footnote omitted).

The Postal Service makes no response to these arguments except to insist that the data is "sufficiently granular to give competitors fresh business insights with respect to certain high-volume countries." USPS Br. 30. But what insights? And which countries? The Postal Service doesn't say. It merely repeats its refrain that competitors could combine the data with other "proprietary and nonproprietary data" to unearth weak spots in its supply chain. USPS Br. 26; *see also* USPS Reply 14-15. Given these feeble objections, we see no reason to disagree with the conclusion that the Postal Service's allegations are "conclusory and unsupported." J.A. 671.

The Postal Service also argues that the data could harm its negotiations with foreign nations. But again, the Commission reasonably concluded that any such harms would be minimal. First off, because the data is not country-specific, the most it could provide is some information about the Postal Service's *average* cost of delivery. And that average cost may not "accurately represent the Postal Service's costs to provide the services included" in any particular negotiated agreement,

since many agreements cover related issues and services that affect delivery costs. J.A. 673-74.

The Postal Service further contends that the Commission should not have disclosed the data at this time. The Postal Service reasons that the public no longer has an interest in disclosure because UPU reforms have fixed the problem; now that the United States can set some of its own rates, the Postal Service shouldn't continue to bleed cash. But we "judge the reasonableness of an agency's decision on the basis of the record before the agency at the time it made its decision." *NTCH, Inc. v. FCC*, 950 F.3d 871, 881 (D.C. Cir. 2020) (internal quotation marks omitted). And in any event, the Commission concluded that "factors other than the existing UPU [rates] structure contribute to [Inbound Letter Post's] poor financial performance" and that the public has an interest in understanding why this service lost money in the past. J.A. 654.

Finally, the Postal Service suggests that disclosure isn't necessary because interested parties can already view the data under protective conditions. But, as the Commission explained, this alternative imposes restrictions that "unfairly burden participants" and "hinder" transparency. J.A. 657; *see also* Intervenor Br. 7-8 (noting that this alternative "limit[s] an organization's ability to share information with its members, receive feedback, and develop informed comment"). Reasonable minds could certainly debate the appropriate balance between the public interest and the risk of commercial harm in the first instance. But under our deferential standard of review, we find the Commission's decision reasonable.

11

2

The Postal Service argues that the Commission's decision is arbitrary and capricious because it failed to adequately consider the dissenting Commissioners' arguments. Although the Commission is "not required to agree with arguments raised by a dissenting Commissioner, it must, at a minimum, acknowledge and consider them." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 20 (D.C. Cir. 2010) (citation omitted); *see also Chamber of Commerce v. SEC*, 412 F.3d 133, 144-45 (D.C. Cir. 2005). The Commission did just that. It considered and rejected the arguments that disclosure could harm negotiations and create new opportunities for domestic competition. The Postal Service's true objection seems to be that the Commission unreasonably rejected these arguments, not that it failed to address them. That simply reprises the first argument, and it fares no better once repackaged.

3

Finally, the Postal Service objects that the Commission's decision provides no workable standard to guide its assessment of future confidential submissions. The Postal Service attempts to analogize this case to *USPS v. Postal Regulatory Comm'n* (*USPS I*), 785 F.3d 740, 753 (D.C. Cir. 2015), in which we held that the Commission "fail[ed] to articulate a comprehensible standard" for rate adjustments. But that case is far afield. There, the Commission set out a "cryptic" standard, failed to explain how that standard applied to the facts, and worse still, applied that standard inconsistently across similar cases. *Id.* at 754. Here, the Act itself provides the test the Commission must apply. 39 U.S.C. § 504(g)(3)(A). And while the Postal Service complains that the Commission rejected its allegations of commercial harm without saying what allegations *would* suffice, the Commission adequately explained the problems it

saw with each chain of inference and it need not announce in advance how it might rule on other hypothetical scenarios. *See SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 203 (1947).

## III

Because the Commission's order is neither contrary to law nor arbitrary and capricious, we deny the petition for review.

*So ordered.*

RAO, *Circuit Judge*, concurring: I join the court's opinion in full. I write separately to note the constitutional quandary raised by a federal court resolving a lawsuit between two Executive Branch agencies. On one side of this dispute, we have the United States Postal Service—"an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. On the other, we have the Postal Regulatory Commission—"an independent establishment of the executive branch of the Government of the United States." *Id.* § 501. Litigating on behalf of the Commission, the Department of Justice has taken sides in a disagreement between two Executive Branch entities tasked with oversight and administration of the nation's mails.

This litigation stands in tension with Article II of the Constitution, which vests all executive power in the President and assigns him the duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, §§ 1, 3. "Moreover, because agencies involved in intra-Executive Branch disputes are not adverse to one another (rather, they are both subordinate parts of a single organization headed by one CEO), such disputes do not appear to constitute a case or controversy for purposes of Article III." *SEC v. FLRA*, 568 F.3d 990, 997 (D.C. Cir. 2009) (Kavanaugh, J., concurring). The Constitution creates a unitary executive and limits federal courts to deciding the rights of individuals in properly presented cases and controversies. The posture of this case thus presents constitutional questions about the power of an Article III court to resolve a purely Article II dispute. The fact that Congress specifically created federal court jurisdiction between the Postal Service and the Commission, *see* 39 U.S.C. § 3663, does not necessarily eliminate the constitutional concern because Congress cannot expand federal court jurisdiction beyond the Article III judicial power. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 65 (1996) (citing *Marbury v. Madison*, 1 Cranch 137 (1803)).

Our precedents are clear, however, that such disputes between "independent" agencies, such as the Postal Service and the Commission, are justiciable. *See SEC v. FLRA*, 568 F.3d at 997 (Kavanaugh, J., concurring) (collecting cases); *see also USPS v. Postal Regulatory Comm'n*, 886 F.3d 1253 (D.C. Cir. 2018). Therefore, I join the court's well-reasoned opinion in this case.