# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 30, 2019         Decided June 21, 2019

No. 18-1198

FEDERAL EDUCATION ASSOCIATION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

On Petition for Review of an Order of
the Federal Labor Relations Authority

*William Howell Freeman*, *Jr.* argued the cause and filed the brief for petitioner.

*Rebecca J. Osborne*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With her on the brief were *Fred B. Jacob*, Solicitor, and *Tabitha G. Macko*, Attorney.

Before: GARLAND, *Chief Judge*, and PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

2

PILLARD, *Circuit Judge*: The Department of Defense, acting through the Department of Defense Education Activity ("the Agency"), provides schools for the children of service members stationed abroad. Roughly 4,000 of the 15,000 teachers that the Agency employs around the world are represented by the Federal Education Association ("the Union"). In the early 2000s, the Union and the Agency began to arbitrate a compensation dispute. After years of arbitration and multiple decisions by the arbitrator, the Union in October 2015 filed an unfair labor practice charge with the Federal Labor Relations Authority ("the Authority") challenging the Agency's failure to comply with the arbitral awards. The Union petitions us to reverse the Authority's decision that its unfair labor practice charge was untimely, and asks us to retain jurisdiction to ensure that the government complies with the arbitration awards. For the reasons discussed below, we conclude that the charge was timely and therefore grant the Union's petition for review in part. We deny the petition insofar as it asks us to retain jurisdiction. It is up to the Authority to consider in the first instance the Agency's exceptions to the administrative law judge's holding that the Agency had committed an unfair labor practice.

## BACKGROUND

In the early 2000s, the Union came to believe that the Agency was underpaying some of its teachers and failing to provide them with consistent and comprehensible payroll information to enable them to monitor and understand their salary payments. The Union filed a class grievance on the teachers' behalf in 2002, alleging the Agency had "engaged in a persistent pattern of failing to pay or to apprise bargaining unit employees of" the amounts the Agency owed them. Supp. App'x ("S.A.") 3. The Union identified, by way of example, eight underpaid teachers in Germany. Pursuant to

the parties' collective bargaining agreement, the Union sought arbitration in Germany under the auspices of the Federal Mediation and Conciliation Service, an independent agency that maintains a roster of arbitrators who handle labor-management disputes.

Over the next thirteen years, the arbitrator issued four decisions, or "awards." The arbitrator conducted two days of hearings in December 2002. He issued an initial pair of awards in November 2003. In the first award, the arbitrator concluded that the Agency had violated its collective bargaining agreement with the Union, as well as federal law and prior arbitration decisions binding the Agency and Union. He found that the employees at issue "did not receive all of the appropriate payments, back pay and interest to which they were entitled" or, in the alternative, at least "did not receive an adequate explanation of benefits or payments received." S.A. 13 (Nov. 7, 2003 Award). "[E]mployees [were] routinely provided with payments without meaningful explanation of how the payments were derived." S.A. 18. He saw no grounds for the shortfalls where "[n]o technological or other impediment ha[d] been demonstrated that justifie[d] the Agency's failure to provide every bargaining unit employee with a clearly articulated written explanation of what every payment represents, including the basis for computation." S.A. 19. The arbitrator therefore ordered the Agency to submit within sixty days a "proposal for implementing a revised computer program to provide with sufficient specificity the information set forth in" the award. S.A. 45.

The second of the initial pair of awards ordered the Agency, or the Defense Finance and Accounting Service ("DFAS") (a separate Department of Defense component that administers the Agency's—and other agencies'—online payroll system), "or some other entity of the Department of Defense" to "create

or modify its computer programs or other procedures by which bargaining unit employees are paid so that all bargaining unit employees receive with every payment a clear, fully understandable explanation of what is included." S.A. 51 (Nov. 12, 2003, Award). The arbitrator stated that the system must include,

> [f]or example, the nature of the payment, the period represented by the payment, the date of the document submitted for payment, the actual exchange rate of foreign currency upon which the payment was predicated, and the number of units (for example, days or hours) times the applicable rate, whether interest is included, the period covered by the interest, the rate of interest, and the arithmetic computing the interest.

S.A. 51-52. The award specified that "such compliance shall be achieved . . . within a reasonable interval," and that "[f]ailure to comply with this directive within ninety days of this Award [might] result in the imposition of substantial liquidated [damages]." S.A. 52.

The Agency filed exceptions with the Authority. According to the Agency, only the Department of Defense's Chief Financial Officer had the "authority to make the changes" that the arbitrator had ordered; all the Agency itself could do was ask him to make those changes. *U.S. Dep't of Def. Educ. Activity*, 60 F.L.R.A. 24, 25 (2004). The Authority denied the exceptions, concluding that the Agency had not established that satisfying the awards was beyond its power. The awards became final and the Agency began taking steps to comply. In the process, the parties participated in "implementation hearings" before the arbitrator over the next

several years, at which the Agency provided progress reports on its compliance with the arbitrator's order.

In March 2010, after one of the implementation hearings, the arbitrator sent a letter to the parties (his third award, in effect). The letter ordered the Agency to make eight specific changes to the way it presented payroll information to its employees. Specifically, the letter ordered the Agency to modify its payroll interface—within a system called Smart Leave and Earnings Statement ("Smart LES")—by creating links to employee-specific information itemizing for each teacher her or his (1) Living Quarters Allowance, (2) Temporary Quarters Subsistence Allowance, (3) Post Allowance, (4) Thrift Savings Plan contributions, (5) pay lane, (6) Federal Employees' Group Life Insurance, (7) Federal Employees Health Benefits, and (8) debts and repayment obligations. Each category contained further requirements of specific information and how it should be presented: For example, for an employee's Post Allowance (a locality-specific cost-of-living allowance), the arbitrator required that:

> An additional screen from a link on the main Smart LES Page should show Post Allowance paid. By pressing this link, the user should be able to see the name of the employee's location, the nominal [cost-of-living allowance] percentage applicable to the payment, the "effective since" date applicable to the payment for a Post Allowance, and the dates covered by the payment.

S.A. 63.

The difficulty in making those changes, as far as the Agency was concerned, was that the Agency does not control the Smart LES system, which is under the purview of DFAS.

Because one uniform version of Smart LES is used by a number of government components—including the entire Department of Defense and some other parts of the executive branch—any changes to Smart LES have to be proposed to and approved by DFAS. DFAS approval depends on clearance through the "Configuration Control Board," comprised of agency representatives (of the Department of Defense and other DFAS customers) empowered to decide whether proposed changes make sense on a system-wide basis. S.A. 115, 130.

The Agency asked DFAS in April 2010 to make changes to Smart LES to bring it into compliance with the arbitrator's March 2010 award. DFAS responded that same month that neither it nor the Department of Defense was bound by the arbitrator's awards. They were not parties to the arbitration and had not been told that it was happening. Any response DFAS could make to the requested payroll system changes was therefore provided "only as a courtesy to [the Agency] as a customer." S.A. 77. DFAS stressed that it "neither agree[d] to the changes addressed in the [attached] memorandum . . . nor committ[ed] to performing them." *Id*.

DFAS described what "information [was] currently available through the Smart LES and" what changes were "currently being pursued by DFAS." S.A. 78. Addressing in turn each of the arbitrator's eight required modifications, DFAS pointed out ways in which the Smart LES system already conformed to the arbitrator's order and identified other changes underway. Some of its responses were encouraging, and others less so. For the Post Allowance changes, for example, DFAS stated that a new interface would provide some or all of the requested information and would be released once "funding [was] obtained." S.A. 79. By contrast, DFAS asserted that one of the requested changes related to the

Temporary Quarters Subsistence Allowance "would not serve a useful purpose." S.A. 79. Other changes—such as one regarding the monthly rate for the Living Quarters Allowance—were "not available," or—in the case of changes regarding information on debts and repayment obligations—were "not allowed." S.A. 78-79.

Upon receiving DFAS' response, the Agency informed the arbitrator and Union that it had discovered that Smart LES "in its current form" had "most of the structure and functions . . . require[d]." S.A. 82. It then attached the portion of DFAS' letter that explained which changes had already been made or were underway. It did not, however, send to the arbitrator or Union the portion in which DFAS asserted that it was not bound by the arbitrator's awards and was providing its response as a courtesy only.

Three months later, in August 2010, a representative from DFAS met with the parties and the arbitrator to demonstrate how the Smart LES system worked. At the meeting, the Agency argued that the system already complied with the arbitrator's requirements. The Union lawyer disagreed and, as he put it, "took over the demonstration" and showed that it did not comply. S.A. 121. According to the Agency, the DFAS representative stated "that pretty much anything [the Agency] wanted [it] could do in the [S]mart LES, realizing there's a cost associated with it and it still has to get approval." S.A. 136. She then offered to help the Agency write up its request for the Configuration Control Board, which the Agency submitted before the Board's meeting in October 2010. The request resulted in some back and forth within DFAS, and the Configuration Control Board first approved the changes and then disapproved them a few months later (seemingly without the Agency's knowledge either time). Finally, at a Configuration Control Board meeting in May 2011, "[t]he

board approved the request pending getting the cost [billed] to [the Agency] and [its] agreeing to pay." S.A. 112. At the same meeting, a representative from the Agency stated that it was "willing to pick up the cost." S.A. 112.

Over the next few years, the arbitrator continued to hold once-yearly implementation hearings. The Union says that during that time it was "being constantly assured that" the Agency was "working on" compliance. S.A. 125. In 2013, for example, the Union lawyer expressed doubt that the Agency would ever comply with the arbitration awards, in response to which the Agency representative reassured him that he wanted to make the changes and "was working on them." S.A. 127-28.

Ultimately, however, the Agency did not succeed in making all the changes that the arbitrator required. In May 2015, the Agency sent a letter to the arbitrator asking him to hold that the Agency had "complied with the spirit and intent of [his] order" and to relinquish his jurisdiction. S.A. 55. The Agency wrote that DFAS had said in 2010 that the remaining changes would never be made. In response, the arbitrator issued a final award on August 10, 2015, stating that the Agency had "been in non-compliance with the Arbitrator's Award and subsequent orders since 90 days after the [Authority] decision" in 2004 affirming his original award. S.A. 60.

On October 6, 2015, the Union filed an unfair labor practice charge with the Authority, charging the Agency with failure to comply with the arbitration awards. Acting on that charge, the Authority filed a complaint against the Agency, on which an administrative law judge held a hearing. The judge addressed two questions: First, whether the Union's unfair labor practice charge was timely, and, second, whether the Agency

had complied with the arbitrator's awards. On the first question, the judge found that the Union's charge was timely because it was filed within six months of the Union's learning that the Agency would not comply with the arbitrator's order. On the second question, the judge concluded that the Agency had not complied with the awards and had therefore committed an unfair labor practice.

The Agency filed exceptions to the administrative law judge's decision, and the Authority reversed on the ground that the Union filed too late. The Authority held that the Union had express notice by 2010 of the Agency's refusal to comply with the awards, because the Agency had "expressly notified the Union that it could not, and would not, fully comply with the awards" when it forwarded DFAS' letter response in May 2010. App'x ("App.") 2. It further found that, in August 2010 at the meeting with the DFAS representative, "the Union expressly acknowledged that the Agency had not complied with the awards." App. 2. One member of the Authority dissented, and would have adopted the administrative law judge's decision.

## ANALYSIS

### I. The Union's Unfair Labor Practice Charge Was Timely Filed.

The Federal Service Labor-Management Relations Statute authorizes a person or union to file an unfair labor practice charge with the Federal Labor Relations Authority, 5 U.S.C. § 7101 *et seq.* The General Counsel of the Authority may then issue a complaint to the agency charged with the unfair labor practice. *Id.* § 7118(a)(1).

With exceptions not relevant here, an unfair labor practice charge must be filed within six months of when the challenged

practice "occurred." *Id.* § 7118(a)(4)(A). [1] The initial question before us is when the unfair labor practice charged here—the Agency's supposed failure to comply with the arbitration awards—occurred. As we have observed in the past, when an unfair labor practice charge arises out of an arbitration award, "[t]he plain language of the statute . . . requires that the filing period cannot begin at least until there has been a failure to comply with [the] award." *Nat'l Treasury Emps. Union v. FLRA*, 392 F.3d 498, 500 (D.C. Cir. 2004). When "an award orders an action that will take place in the future, a party may fail to comply with the award in two ways": either by "expressly reject[ing] its obligation under the award" or by "simply not tak[ing] the steps ordered by the award." *Id.* at 500-01. If the latter, however, the Agency cannot be said to have failed to comply "at least until the deadline for taking action has passed" without any compliance. *Id.* at 501.

The Authority has adopted this circuit's approach to determining when a party has failed to comply with an arbitration award. *U.S. Dep't of the Treasury, IRS*, 61 F.L.R.A. 146, 150 (2005). Reiterating the two routes to anticipatory noncompliance—express rejection or failure to timely commence compliance—the Authority also recognized that some cases fit neither mold. *Id.* "In such situations, the facts of each case, based upon what an award requires and what a party's actions have been following the award, will determine whether a party has failed to comply with an arbitration award." *Id.*

---

[1] The full text of the provision states that, "[e]xcept as provided in subparagraph (B) of this paragraph, no complaint shall be issued based on any alleged unfair labor practice which occurred more than 6 months before the filing of the charge with the Authority." *Id.*

The FLRA's factual findings are "'conclusive' if 'supported by substantial evidence on the record considered as a whole.'" *SEC v. FLRA*, 568 F.3d 990, 995 (D.C. Cir. 2009) (quoting 5 U.S.C. § 7123(c)). "This standard requires us to defer to the Authority's factual determinations if, taking into account any record evidence to the contrary, the record contains such relevant evidence as a reasonable mind might accept as adequate to support such determinations." *Id.* (quoting *Nat'l Ass'n of Gov't Emps. v. FLRA*, 363 F.3d 468, 475 (D.C. Cir. 2004)).

Here, the Authority and the Agency rely on the express-rejection route identified in *National Treasury Employees Union*. The Authority found that, in May 2010, "the Agency expressly notified the Union that it could not, and would not, fully comply with the awards," and that by August 2010, "the Union expressly acknowledged that the Agency had not complied with the awards." App. 2. In the government's framing, the fact "[t]hat the Union chose not to heed the Agency's express statements of its inability to comply . . . does not toll the deadline for filing [an unfair labor practice] charge." Resp't Br. 17.

That conclusion, however, is unsupported by substantial evidence. The record as a whole cannot sustain the determination that the Agency expressly rejected its obligations under the awards on either of the two dates in 2010 identified by the Authority. Nor did the Agency's "actions . . . following the award," *U.S. Dep't of the Treasury, IRS*, 61 F.L.R.A. at 150, reveal that it had failed to comply with its obligations. It was not until May 2015, when the Agency told the arbitrator that further changes would not be made and asked him to deem it in compliance with the awards, that the Agency expressly rejected its obligations.

The Agency's May 2010 letter did not expressly reject the Agency's obligations. Rather, it suggested that the Agency was already largely in compliance with the awards and would continue to work on meeting their terms. Specifically, the Agency stated that the Smart LES system already had "most of the structure and functions . . . require[d]" by the awards, S.A. 82, and explained that DFAS was in the process of making additional changes, S.A. 78. Importantly, when the Agency forwarded DFAS' response to the Union, it omitted the assertion that DFAS did not view itself as bound to make any changes. The portions of DFAS' response that the Agency did forward—in which DFAS stated that certain changes were "not available" or "not allowed"—did not expressly reject the Agency's obligations. *Id.* at 78-79. Those responses were somewhat discouraging in the short term, but never foreswore compliance with the awards. To the contrary, the Agency expressed its apparent determination to work with DFAS to make the required changes.

The record of communications at the parties' August 2010 meeting with the arbitrator and the representative from DFAS also fails to support the Authority's express-rejection determination. As the government tells it, because the Union representative himself demonstrated at the meeting that the Smart LES system did not meet the terms of the awards, the Union necessarily knew that the Agency was rejecting its obligations. But the record shows that the Agency's position at the meeting was that Smart LES met the terms of the awards, and the Agency's own witness testified before the administrative law judge that the DFAS representative told the Agency and the Union at the meeting "that pretty much anything [the Agency] wanted [it] could do in the [S]mart LES," provided it could get approval and could pay for it. S.A. 136. At no point during the meeting did the Agency refuse to engage in further discussion or repudiate its

obligation to make changes to comply with the award, and the Union's behavior cannot reasonably be read to acknowledge any such rejection.

Even in communications outside the arbitrator's presence—where the Agency would presumably have had less incentive to put a positive spin on its efforts—the Agency did not seem to think that compliance was impossible. In June 2011, for example, the Agency and DFAS went back and forth via email about a potential cost estimate for implementing the remaining changes. The Agency expressed eagerness to get an estimate so that it could "allocate money for the . . . upgrades." S.A. 106. DFAS provided a rough estimate and noted that it might be "quite a while" before some of the changes could be implemented. S.A. 105. The Agency responded that it wanted to "put together a plan (even if the plan [was] an incremental roll out) so" that it could tell the arbitrator "when changes will start to appear." S.A. 104. The thrust of the exchange was that making the changes might take a long time and require significant coordination, but that they were achievable and the Agency remained committed to full compliance. Of course, communications that were unknown to the Union could not undermine an otherwise-express rejection. But evidence that the Agency had not in fact given up on making the required changes at the time of the supposed rejection tends to support our conclusion that nothing in the record communicated that it had.

In sum, the Agency did not expressly reject its obligations under the arbitration awards either in its May 2010 letter or at the August 2010 meeting. Rather, when viewed in light of the record as a whole, the Agency's communications reflected its continuing efforts to implement the required changes. The Authority's finding that the Agency had openly refused to make certain changes as of 2010 is thus not supported by

substantial evidence.  It was not until May 2015, when the Agency told the arbitrator that the remaining changes would not be made, that the Agency expressly rejected any further requirements of the awards.  Measured from that May 2015 rejection, the Union's October 2015 unfair labor practice charge was timely.

## II.  Retaining Jurisdiction Is Unwarranted.

The Union argues that we "should retain jurisdiction to enforce the [unfair labor practice]," Pet'r Br. 52, presumably by supervising the Agency's compliance with the arbitration awards.  According to the Union, the Authority is biased in favor of employing agencies and against unions.  "Remanding to the Authority to pursue enforcement proceedings would . . . mean nothing," *id.*, the Union says, because the Authority would just "fabricate another reason to overrule" the administrative law judge, *id.* at 51.  We decline the Union's request.

The Union's sole factual support for its assertions of bias is a chart it created comparing the outcomes of Authority cases during the current presidential administration to the outcomes during the previous two.  According to the comparison, unions have fared worse under this administration than in prior years, and it attributes that lack of success to the Authority's bias.  But a simple win-loss chart does not demonstrate that the Authority has prejudged the cases.  We need not decide when, if ever, it might be appropriate for us to retain jurisdiction to ensure enforcement in order to conclude that the Union has failed here to show that doing so would be appropriate.

\*          \*          \*

For the reasons discussed above, we grant the Union's petition for review in part.   We reverse the Authority's

determination that the unfair labor practice charge was untimely, but we deny the petition insofar as it asks us to retain jurisdiction. We remand for the Authority to address the merits of the Union's unfair labor practice charge.

*So ordered.*